# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**      **:**

     **v.**      **:**      **CRIMINAL NO. 22-435**

**TODD GOODMAN**
**ERIC PESTRACK**      **:**

## ORDER

     AND NOW, this _____ day of _____, upon consideration of

Defendant Todd Goodman's Pretrial Motions (ECF No. 30) and the Government's Response in

Opposition, it is hereby **ORDERED** that the motions are **DENIED.**

         **BY THE COURT:**

         _____

         **HONORABLE HARVEY BARTLE, III**
         ***Judge, United States District Court***

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 22-435 |
| TODD GOODMAN | : | |
| ERIC PESTRACK | | |

## GOVERNMENT'S RESPONSE IN OPPOSIITION
## TO DEFENDANT TODD GOODMAN'S PRETRIAL MOTIONS

The United States of America, by its attorneys Jacqueline C. Romero, United States

Attorney, and Joan E. Burnes and Eileen Castilla Geiger, Assistant United States Attorneys for

the District, respectfully submits the following response opposing defendant Todd Goodman's

pretrial motions to dismiss the indictment and for disclosure of various materials (ECF No. 30),

which co-defendant Eric Pestrack has requested to join.[1]

Defendant Goodman moves to dismiss the indictment on the basis that the government

presented incomplete, inaccurate, misleading, and prejudicial testimony to the grand jury. The

defendant is not entitled to such extraordinary relief. He has not come close to showing that the

government committed misconduct, let alone any egregious abuse, in its grand jury presentation.

Nor has the defendant proven that any alleged error in testimony caused prejudice. Accordingly,

the defendant's dismissal motion should be denied.

The defendant also moves the Court for an order requiring the government to produce

and identify any intention to use prior or other bad acts evidence at trial, as well as impeachment

material contained in the files of any law enforcement officer witnesses. The defendant further

---

[1] The defendants have each filed motions to join each other's respective pretrial motions. *See* ECF No. 31-1 at 19; ECF No. 32. The government does not oppose the defendants' motions to join the motions of their co-defendant, to the extent that they themselves have standing to assert such motions.

urges the Court to order the government agents to preserve all rough notes and draft reports of interviews, and to disclose these to the Court for its review. For the reasons set forth more fully below, these pretrial disclosure requests should be denied as moot.

## I. Relevant Background

From 1987 through 2021, Mitchell Spivack, a licensed pharmacist, owned and ran Verree Pharmacy ("Verree"), a small, Fox Chase neighborhood pharmacy that was open seven days per week. Indictment ¶¶ 1-2, pg. 1, 22 Cr. 435, ECF No. 1 (December 1, 2022). Verree was registered with the Drug Enforcement Administration ("DEA") to purchase and dispense Schedule II through V controlled substances. *Id*. ¶ 2, pg. 1. For approximately twenty years, Todd Goodman was a part-time pharmacist at Verree. *Id*. ¶ 3, pgs. 1-2. Likewise, for more than thirty years, Eric Pestrack was the lead pharmacy technician at Verree. *Id*. ¶ 4, pg. 2.

Verree cultivated a reputation as an easy-fill, no-questions-asked pharmacy for patients seeking to fill opioid prescriptions. *Id*. ¶ 21, pg. 8. In fact, Verree became the top retail pharmacy purchaser of oxycodone in Pennsylvania. *Id*. An investigation conducted by the Pennsylvania Attorney General's Office Bureau of Narcotics Investigation ("BNI"), together with the DEA and the Department of Health and Human Services Office of the Inspector General ("HHS-OIG"), revealed that, from at least 2012 through 2019, Goodman, Pestrack, and Spivack conspired to distribute controlled substances outside the course of professional practice and without a legitimate medical purpose. *See id*. ¶ 20, pg. 7; Goodman Mot. Appx., ECF No. 30-1 ("Appx.") A.104.

As part of the scheme, the co-conspirators dispensed and distributed, and aided and abetted the distribution of, controlled substances based on obviously altered prescriptions for oxycodone. Indictment ¶ 22, pg. 8; *id*. ¶ 2, pg. 13. They did so without verifying the forged

prescriptions with the issuing physician, and ignoring obvious "red flags."[2]  *Id*. ¶ 22, pg. 8.

Moreover, to avoid scrutiny by health care benefit programs which monitored the amount of

opioids dispensed, the co-conspirators frequently required payment in cash for oxycodone

prescriptions, even when the customer had insurance.  *Id*. ¶ 23, pg. 8.

For example, from 2012 until 2019, Goodman and Pestrack filled forged oxycodone

prescriptions for customers Mohamed and Linda Ahmad.  *See* Indictment ¶¶ 1-3, pgs. 10-11; *id*.

¶ 2, pg. 13; Appx. A.006, A.012-.013, A.117-118.  The Ahmads paid more than $150,000 in cash

for their altered prescriptions to be filled over this seven-year period.  *See* Appx. A.118.  Verree

did not verify the obviously forged prescriptions with the doctor who allegedly prescribed the

drugs, Dr. J.E.  *See* Indictment ¶ 22, pg. 8; Appx. A.015, A.018, A.061; 119-121.  And when

Mohamed Ahmad presented a legitimate insurance card to pay for the oxycodone prescriptions,

Pestrack urged him to pay in cash.  Indictment ¶ 23, pg. 8.

During the relevant time period, Rochester Drug Coooperative ("RDC") served as

Verree's wholesale supplier of controlled substances.  Appx. A.018, A.076.  In August 2016,

RDC's compliance department urged Verree to create policies to prevent diversion of controlled

substances by its customers, given RDC's concerns about Verree's opioid distribution.

Indictment ¶ 25, pg. 9.  As a result, Verree created a "Due Diligence Procedure for Controlled

Substances" to ensure that RDC would continue to supply oxycodone.  *Id*.  Spivack, Goodman,

Pestrack, and L.K. (a pharmacy technician at Verree) signed the policy document, confirming

that they would enforce the procedures as written.  *Id*.; *see also* Appx. A.229-230.  Despite their

assurances, the Verree employees failed to adhere to the policies.  Indictment ¶ 25, pg. 9.  In

---

[2] A "red flag" includes anything about a controlled substance prescription that would cause the pharmacist to be concerned that the prescription was not issued for a legitimate medical purpose by a registered prescriber in the usual course of professional practice.  *See id*. ¶ 18, pg. 6 (listing examples of red flags).

November 2018, RDC notified Verree that it would impose a mandatory reduction in the amount of controlled substances that it would provide, due to ongoing concerns over the pharmacy's diversion practices. *Id*. ¶ 26, pg. 9. Around the same time that RDC limited Verree's opioid supply, the defendants created a "Narc Members" club that required patients to pay "dues" to ensure that their prescriptions for oxycodone would be filled without question. *Id*. "Narc Members" typically paid the defendants monthly dues of between $25 to $100 in cash, in addition to their co-pays or the costs of their prescriptions if they paid in cash. *Id*.

On June 29, 2022, Spivack pled guilty to a one-count information charging him with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Information, 22 Cr. 166, ECF No. 1 (May 31, 2022). Spivack agreed that he conspired, together with unindicted co-conspirators (including Goodman and Pestrack), to violate 18 U.S.C. § 1347, by submitting fraudulent claims to Medicare and Medicaid for prescription drugs not dispensed, and 21 U.S.C. § 1347, by filling medically unnecessary prescriptions for large quantities of oxycodone.[3] *Id*.

On December 1, 2022, a federal grand jury returned a nine-count indictment charging Goodman and Pestrack with conspiring (with Spivack) to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count One), and distributing, and aiding and abetting the distribution of, controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(E) and 18 U.S.C. § 2 (Counts Two through Ten). *See* Indictment. To narrow the issues for the

---

[3] On October 10, 2022, this Court sentenced Spivack to 42 months' imprisonment, to be followed by three years' supervised release. Spivack was also ordered to pay restitution of $250,000 and forfeiture of $116,000. As part of a civil settlement, Spivack paid approximately $2.9 million for False Claims Act and Controlled Substances Act violations.

upcoming trial, the government will move to dismiss Counts Two and Ten, and will submit a motion and proposed order to that effect for the Court's consideration.[4]

Defendant Goodman, joined by co-defendant Pestrack, now moves to dismiss the indictment, and for the disclosure of various materials. Goodman Mot., ECF No. 30-1; Pestrack Mot. at 19, ECF No. 31-1. For the reasons set forth below, these motions lack merit and should be denied.

## II.    Motion to Dismiss Indictment

First, the defendant moves to dismiss the indictment, arguing that the government knowingly presented incorrect and prejudicial testimony to the grand jury. Goodman Mot. at 1. As will be discussed further below, the government did no such thing. But even if it had, none of the alleged violations "raise[s] a substantial question, much less a grave doubt, as to whether [it] had a substantial effect on the grand jury's decision to charge." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988).

### A.  Relevant Legal Standard

"In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." *United States v. Hedaithy*, 392 F.3d 580, 589 (3d Cir. 2004). Dismissal of an indictment is an "extreme remedy," reserved "only for the most egregious abuses of the criminal process." *United States v. Fisher*, 692 F. Supp. 495, 501 (E.D. Pa. 1988) (quoting *United States v. Birdman*, 602 F.2d 547, 559 (3d Cir. 1979)); *see also United States v. Martino*, 825 F.2d 754, 759 (3d Cir. 1987) (noting that the Third Circuit had not once ordered dismissal of an indictment based on prosecutorial

---

[4] Counts Two and Ten of the indictment relate to the defendants' dispensing of controlled substances to patients C.N. and M.P., respectively. Counts Three through Nine, in turn, relate to the defendants' distribution of controlled substances to Mohamed and Linda Ahmad.

misconduct before the grand jury). In light of "the grand jury's singular role in finding the probable cause necessary to initiate a prosecution," courts generally lack authority "for looking into and revising" the grand jury's judgment. *Kaley v. United States*, 571 U.S. 320, 328 (2014). Indeed, a "defendant who seeks to set aside an indictment bears a heavy burden." *United States v. Fenton*, 1998 WL 356891, at *4 (W.D. Pa. June 29, 1998).

The Fifth Amendment does not "prescribe[ ] the kind of evidence upon which grand juries must act." *Costello v. United States*, 350 U.S. 359, 362 (1956). Accordingly, the Supreme Court has held that an indictment may not be quashed because it is based in part upon incompetent evidence. *Holt v. United States*, 218 U.S. 245, 247-48. Nor is an indictment subject to challenge where "all the evidence before the grand jury was in the nature of 'hearsay.'" *Costello*, 350 U.S. at 363. "Even an indictment based in part on evidence obtained in violation of the Fifth Amendment is not subject to dismissal." *Fenton*, 1998 WL 356891, at *4 (citing cases). Such illegally obtained evidence may be excluded at trial, but that remedy does not bar the prosecution altogether. *United States v. Williams*, 504 U.S. 36 (1992). As the Supreme Court has noted, "Over the years, we have received many requests to exercise supervision over the grand jury's evidence-taking process, but we have refused them all." *Id*. at 50.

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova* Scotia, 487 U.S. at 254. Under this standard, "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id*. at 256 (citation omitted).

In *Bank of Nova Scotia,* the Supreme Court noted that there are certain cases in which "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Id.* at 257. But the Court called these "isolated exceptions to the harmless-error rule," and provided, as examples, only two cases in which racial or sex discrimination during the selection of grand jurors had compelled dismissal of the indictments because it could be presumed that discriminatorily selected grand jurors would treat defendants unfairly. *Id.*; *see also United States v. Perez*, 246 F. App'x 140, 143-44 (3d Cir. 2007) (explaining that the standard of review where the defendant does not allege structural error or fundamental unfairness in grand jury proceedings is governed by the harmless error rule); *United States v. Soberon*, 929 F.2d 935, 940 (3d Cir. 1991) ("[T]he requirement of prejudice is excused only in extreme cases, where the 'structural protections of the grand jury' have been compromised and remedies other than dismissal would be impractical.").

In *Williams*, the Supreme Court further cabined the limitation in *Bank of Nova Scotia* upon the supervisory power of the court to dismiss an indictment only upon a finding of prejudice. The Court held that an indictment could not be dismissed because of a prosecutor's failure to disclose exculpatory evidence to a grand jury. *Williams*, 504 U.S. at 46-47. In so holding, the Court examined the history of the grand jury, its functional independence from the three branches of government, and the Court's own longstanding refusal to "exercise supervision over the grand jury's evidence-taking process." *Id.* at 50. The Court ultimately found that "[t]hese authorities suggest that any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one." *Id.* Together with *Bank of Nova Scotia*, *Williams* thus "seems to suggest that only where violations of positive law embodied in a

rule of criminal procedure, a statute or the Constitution are raised may a court review an indictment with a view toward possible prejudice in the grand jury proceedings." *Fenton*, 1998 WL 356891, at *6 (citing *In re Grand Jury,* 103 F.3d 1140, 1145 (3d Cir. 1997) ("Judicial supervision and interference with grand jury proceedings should always be kept to a minimum[.]")).

Here, the defendant has not come close to satisfying his "heavy burden." The defendant has failed to prove that the government committed misconduct, much less that it was prejudiced by any purported error. Each of the challenges raised by the defendant will be addressed in turn.

### B. Evidence of Fraud Scheme

First, the defendant contends that "the prosecutor . . . presented to the grand jury extremely prejudicial evidence of a supposed almost $1 million fraud engaged in by codefendants Goodman and Pestrack (and others) that is not charged in the indictment." Goodman Mot. at 3-4. Specifically, the defendant takes issue with the fact that, in April 2022, Investigator Sherilyn Gillespie, from the Pennsylvania Department of State Bureau of Enforcement and Investigation, testified before the grand jury about Verree's "Bill But Don't Fill" ("BBDF") scheme, in which the defendants billed certain prescriptions to insurance carriers and Medicare but never actually filled them. *Id*. at 2-3; *see also* Appx. A.109-117. According to the defendant, presentation of this evidence warrants the extreme remedy of dismissing the indictment.

The defendant is wrong. While "[w]illful prosecutorial misconduct may be demonstrated through 'a constitutional violation that results from a reckless disregard for a defendant's constitutional rights,' . . . 'the challenged conduct must be shocking, outrageous, and clearly intolerable' and [ ] 'this is an extraordinary defense reserved for only the most egregious

circumstances.'" *United States v. House*, 2015 WL 4111457, at *24 (W.D. Pa. July 8, 2015) (citing *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 255-56 (3d Cir. 2005) and *United States v. Nolan-Cooper*, 155 F.3d 221, 230-31 (3d Cir. 1998)); *see also United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979) (discussing that abuse of grand jury proceedings that are "entrenched" or "flagrant or persistent" may warrant dismissal of indictment with prejudice). The defendant has not come close to making this showing.

For starters, the government in no way erred in eliciting testimony regarding this scheme. In June 2022 (three months after Investigator Gillespie's testimony), the defendant's co-conspirator, Spivack, pled guilty to participating in a conspiracy concerning the BBDF prescriptions. Testimony concerning the defendants' BBDF scheme was critical to Spivack's conviction. *See* Information, 22 Cr. 166, ECF No. 1. The fact that this testimony supported Spivack's conviction alone renders presentation of this evidence before the grand jury entirely proper. Not only that, such testimony was accurate and germane to the charges in the instant indictment. Both interrelated schemes related to the defendants' unlawful dispensing practices at Verree Pharmacy. *See, e.g.*, *United States v. Gagliardi,* 285 F. App'x 11, 17 (3d Cir. 2008) (no misconduct where prosecutor elicited testimony regarding criminal actions not charged in the indictment because testimony "was arguably connected to the offenses the government sought to charge"); *United States v. Fisher,* 692 F. Supp. 495, 503 (E.D. Pa. 1988) (no misconduct where prosecutor told grand jury defendant was involved in kickback scheme "from day one" where statement was arguably true).

The fact that Goodman and Pestrack were ultimately not charged with participating in the BBDF scheme—despite substantial evidence supporting their involvement in it, *see* Appx.

A.109-A.117[5]—does not render the presentation of grand jury testimony concerning this illicit activity to be in any way "improper." *See* Goodman Mot. at 4. The defendant is unable to cite any authority concluding that presentation of uncharged misconduct before the grand jury warrants dismissal of an indictment. To the contrary, courts within this circuit have consistently rejected attempts to dismiss an indictment based on similar arguments. *See, e.g.*, *United States v. Fields*, 2016 WL 1428113, at *9110 (E.D. Pa. Apr. 12, 2016) (denying defendant's motion to dismiss based, *inter alia*, on claim that the "prosecution introduced prejudicial information in the form of evidence about his prior criminal conduct," explaining that "the quality of the evidence that can be presented to the grand jury has a broad scope—even if that evidence is hearsay or exclusively inculpatory"); *United States v. Menendez*, 2015 WL 5703199, at *11 (D.N.J. Sept. 28, 2015) (declining defendants' attempt to dismiss an indictment for bribery based on government's presentation of evidence to grand jury concerning defendants' sexual relationships with witnesses, as well as abuse of staff members); *United States v. Fenton*, 1998 WL 356891, at *6 (W.D. Pa. June 29, 1998) (rejecting defendant's argument "that the introduction before the grand jury of his mental health records and the pending state charges is prosecutorial misconduct warranting a dismissal of the indictment").

Nor has the defendant come close to showing that the testimony presented concerning the BBDF scheme had any effect, let alone a "substantial effect," on the grand jury's decision to lodge the charges in the indictment. *See Bank of Nova Scotia*, 487 U.S. at 256. Here, ample evidence supported the grand jury's decision to find probable cause, including testimony from two seasoned law enforcement officials.

---

[5] As Investigator Gillespie testified, and as the defendant highlights in his motion, over 900 BBDF prescriptions corresponded to Goodman, and approximately 2,800 corresponded to Pestrack. *See* Appx. A.116; Goodman Mot. at 3.

In addition to testifying about the BBDF scheme in April 2022, Investigator Gillespie thoroughly testified regarding the defendants' filling of obviously forged oxycodone prescriptions for Mohamed Ahmad. Specifically, Investigator Gillespie described that the DEA became interested in Verree Pharmacy because, despite being "very small," Verree was "the number one purchaser of oxycodone in Pennsylvania." Appx. A.105. Investigator Gillespie also testified that Ahmad filled prescriptions for himself and his wife that he had forged approximately 275 times at Verree Pharmacy from 2013 through July 2019. *Id*. A.117. Ahmad paid Verree Pharmacy over $150,000 to get his forged prescriptions for oxycodone. *Id*. A.118.

Investigator Gillespie showed the grand jury examples of the obviously forged prescriptions. *See* Appx. A.119-123. Some of the red flags on the prescriptions included: obvious alterations and manipulations (such as names changed, and dates scratched off and scribbled over on); controlled and non-controlled substances written on the same prescription; "strange separating line[s]"; "Rx" being written instead of "Dx" for a diagnosis code; obvious circling on the number of refills (even though DEA does not permit refills on Schedule II controlled substances); high quantities and high dosages of controlled substances; and the notation "WC" (standing for worker's compensation) on prescriptions to hide the fact that Verree was receiving cash for these prescriptions. *See* Appx. A.119-124, A.126-127. In addition, Investigator Gillespie testified that another "red flag" included Verree's filling of numerous prescriptions from "doctors that were farther away from Verree Pharmacy and patients that lived outside the state." *Id*. A.123. Investigator Gillespie also stated that, in June 2017, the amounts of pills on the prescriptions began to increase, drawing investigators' attention. *Id*. A.121-122. Moreover, and significantly, "Verree Pharmacy filled [the] majority of the oxycodone prescription[s] for cash only for profit." *Id*. A.124. As Investigator Gillespie testified, Verree

employees told the Ahmads that they would not accept insurance to fill oxycodone prescriptions, and that they must pay in cash. *Id*. A.124-125. Investigator Gillespie further testified that the doctor whose name was on the forged prescription, Dr. J.E., notified investigators that, despite all these glaring "red flags," the pharmacy never called him to verify the prescriptions. *Id*. A.119-121.

Investigator Gillespie also testified about how Verree made false statements and misrepresentations to its controlled substance distributor, RDC. Appx. A.127. Specifically, Spivack, Goodman, Pestrack, and L.K. signed a due diligence policy and provided it to RDC to assure the supplier that they were filling controlled substance prescriptions responsibly. *Id*. A.130-131. But the employees altogether failed to follow the policy that they had signed. *Id*. A.131. Finally, Investigator Gillespie testified that, in addition to the forged prescriptions filled by the defendants, they also dispensed other suspicious prescriptions for controlled substances, including prescriptions for dangerous "Trinity Cocktails" (which "can cause severe respiratory depression and death"). *Id*. A.133, A.148-149. Despite the "red flags" raised by these prescriptions, the Verree employees never contacted the physicians to determine whether these were legitimate prescriptions. *Id*. A.133.

In addition to Investigator Gillespie's detailed testimony, BNI Agent John Gregory's grand jury testimony corroborated the charges. Specifically, Agent Gregory testified that Mohamed Ahmad had been negotiating fraudulent prescriptions at Verree Pharmacy dating back to 2012 for almost seven years. Appx. A.006. Altogether, the agents identified over 200 forged prescriptions that Verree had filled for Ahmad. *Id*. A.012. Agent Gregory testified that Ahmad admitted to forging the prescriptions by drawing a line in the center of the prescription the doctor had written for him for Voltaren gel and writing oxycodone with the falsified amounts and

dosage units. *Id*. A.007. Moreover, Agent Gregory stated that Ahmad had informed him that Pestrack told him he would have to pay in cash for these prescriptions, despite having insurance. *Id*. A.009-010.

Significantly, and like Investigator Gillespie, Agent Gregory testified about the numerous "red flags" raised by Ahmad's prescriptions, including the amount of pills Verree was dispensing, the high corresponding dosage units, and the high amounts of cash payments (including as much as $1,000 a month) to Verree. Appx. A.006-007, A.017-018. Further, some of the prescriptions Verree had filled for Ahmad had a non-controlled medication on one side, and a controlled substance on the other. *Id*. A.014. The prescriptions also appeared obviously "manipulated," and had incorrect diagnosis codes. *Id*. A.015, A.017. Despite obvious alterations on the prescriptions, Goodman and Pestrack never called the prescribing doctor to verify the legitimacy of the prescriptions before filling them. *Id*. A.015, A.018, A.061; *see also id*. A.052. During Agent Gregory's testimony, the grand jury was shown examples of the forged prescriptions themselves and corresponding pharmacy server data. *Id*. A.013-014, A.016-018.

Additionally, Agent Gregory testified about how RDC noticed irregularities in Verree's dispensing practices, including that its orders were the "highest in the State of Pennsylvania" for a mom-and-pop type of pharmacy, that their use of the state's prescription-monitoring system was "sporadic," and that their cash payments accepted for controlled substances exceeded ten percent. Appx. A.021-023. A compliance auditor visited RDC, and per RDC's request, Spivack, Goodman, Pestrak, and L.K. signed a due diligence policy for controlled substances.[6] *Id*. A.020-022. But the employees failed to adhere to this policy. As Agent Gregory testified, RDC then limited the amount of controlled substances that the pharmacy could purchase from it. *Id*. A.023.

---

[6] This policy was shown to the grand jury. *See* Appx. A.020, A.229-230.

In response, Verree created a "Narc Members" club, requiring certain customers to pay extra fees on top of their insurance for controlled substances. *Id*. A.025-A.031.[7]

Given this overwhelming corpus of evidence, the defendant is wholly unable to show that Investigator Gillespie's testimony concerning the BBDF scheme in any way "substantially influenced" the charges that were lodged. *Bank of Nova Scotia*, 487 U.S. at 256; *see also United States v. Soberon*, 929 F.2d 941 (3d Cir. 1991) (holding that the district court erred in dismissing the charges against a defendant on the basis of prosecutorial misconduct in the absence of a showing that he was prejudiced by the purported misconduct); *Fields*, 2016 WL 1428113, at *8 ("Even if any of the disclosures identified by Defendant amount to a violation of Rule 6(e), Defendant has failed to meet the requirements of the pertinent standard for dismissal of an indictment in this situation, which is exceptionally high.").

---

[7] In addition to the agent testimony, L.K. provided testimony supporting the charges in the indictment. For example, L.K. testified about how the pharmacist and technician working on a particular day would log into Verree's system, inputting their initials. Appx. A.189-191. L.K. also testified about the discrepancies on one of Ahmad's forged prescriptions, including alterations on the prescription and the fact that the prescription provided for refills (even though he understood that refills were not allowed under federal law for a controlled substance). *Id*. A.197-198. This forged prescription was shown to the grand jury as an exhibit. *Id*.

Moreover, L.K. testified that when Ahmad came in to pay for his prescriptions, he paid Pestrack (whom Ahmad called "Dr. Eric") for them in cash. *Id*. A.199-200. Other patients, too, regularly paid Pestrack in cash for their prescriptions. *Id*. A. 207-208. Furthermore, L.K. testified that despite Goodman expressing concerns about the prescriptions he filled for Ahmad (such as that he thought 360 pills was too much), Goodman and Pestrack filled them anyway. *Id*. A.201-202, 207, 219. According to L.K., Goodman and Pestrack filled three oxycodone prescriptions in the month of May 2017 for Ahmad, a practice which L.K. testified was "absolutely not" safe. *Id*. A.205-207. L.K. further testified that a compliance auditor from RDC came to Verree and expressed his concerns about the pharmacy's high quantities of opioids being dispensed. *Id*. A.210. RDC subsequently reduced Verree's ordering ability to fill narcotics prescriptions. *Id*.

Finally, L.K. testified that to retain customers, Spivack, Pestrack, and/or Goodman made the decision to charge a monthly membership fee to certain customers to guarantee that they would fill their opioid prescriptions each month. Appx. A.211-212. And these customers did not know that the pharmacy called them "Narc Members." *Id*. A.212.

In short, the government's presentation of testimony concerning the BBDF scheme was entirely proper. But regardless, even if the defendant could prove "shocking" and "outrageous" misconduct (which he cannot), he has failed to establish prejudice.

## C. Exculpatory Evidence

Second, the defendant faults the government for failing to introduce purportedly exculpatory evidence to the grand jury, arguing that this supports dismissing the indictment. In particular, the defendant claims that the "government failed to elicit the exculpatory fact [from Investigator Gillespie] that neither [defendant] profited from . . . alleged billings" from the BBDF scheme. Goodman Mot. at 3. Along this vein, the defendant bemoans that Agent Gregory failed to inform the grand jury of the purportedly exculpatory fact that Patient 7, M.P.— who lived in New Jersey and traveled to Verree Pharmacy in Philadelphia to receive his prescriptions—worked in Pennsylvania.[8]  *Id*. at 6-8.

This argument utterly lacks merit. For starters, Goodman and Pestrack did, in fact, profit from Verree's fraudulent schemes. As the government's discovery reflects, they received numerous bonuses from Verree, including regular checks of over $1,000 and $300 to Pestrack and Goodman, respectively.[9]  Moreover, as M.P.'s interview report reflects, he conceded that he "would have chosen a pharmacy closer to home in New Jersey to save on gas, tolls, and his time, but Verree Pharmacy was reliable and filled his pain prescriptions without questions or issues." Appx. A.160. Contrary to the defendant's claim, therefore, M.P.'s filling of his prescriptions at Verree when he resided out-of-state was indeed a "red flag."

---

[8] As discussed above, the government intends to move to dismiss Count Ten, which relates to the filling of M.P.'s prescription at Verree.

[9] Copies of these checks, which were produced in discovery, are bates numbered VP-044563-044904.

Additionally, both types of evidence that the defendant criticizes the government for not presenting—the defendants' alleged lack of profits, and the fact that M.P. worked in Pennsylvania—are not exculpatory. *See United States v. Johns*, 742 F. Supp. 196, 222 (E.D. Pa. 1990), *aff'd*, 972 F.2d 1333 (3d Cir. 1991) (concluding that "the government's refusal to inform the grand jury that Acme had suffered no quantifiable loss as a result of [the defendant's alleged scheme" "would not have been exculpatory"). Neither fact "goes to the heart of the defendant's guilt or innocence," nor would have altered the grand jury's judgment. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Moreover, and significantly, the defendant's argument flies in the face of Supreme Court precedent. As discussed above, the Supreme Court has held that a district court may *not* "dismiss an otherwise valid indictment because the government failed to disclose to the grand jury 'substantial exculpatory evidence' in its possession." *Williams*, 504 U.S. at 37-38; *see also id*. at 52 ("Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system."); *see also United States v. Minerd*, 299 F. App'x 110, 112 n.1 (3d Cir. 2008); ("[T]o the extent that [the defendant] alleged that the government failed to present exculpatory evidence to the grand jury, an indictment may not be dismissed on these grounds."); *United States v. Slade*, 2013 WL 3344341, at*3 (E.D. Pa. July 3, 2013) ("District courts are not authorized to dismiss indictments on the basis that the Government may have failed to provide exculpatory evidence to the grand jury."); *United States v. Jones*, 2012 WL 85424, at *3-4 (E.D. Pa. Jan. 10, 2012) (declining to dismiss indictment and explaining rationale for rule that the government is under no obligation to present exculpatory evidence to the grand jury). This is especially the case under the circumstances here, where the government presented overwhelming evidence to the grand jury supporting the charges.

### D. Misrepresentations in Testimony

Lastly, the defendant argues that the indictment should be dismissed given Agent Gregory's alleged misrepresentations during his testimony. Goodman Mot. at 8-10. Contrary to the defendant's claim, Agent Gregory did not falsely testify. In any event, the defendant has failed to show that the decision to indict was influenced in any way by the purported errors in Agent Gregory's testimony.

First, the defendant takes issue with Agent Gregory's testimony concerning the number of oxycodone pills filled by Verree for Mohamed Ahmad's forged prescriptions. The following relevant exchanges regarding the quantity of pills took place during Agent Gregory's testimony:

*Appx. A.006*

A. (Agent Gregory) Mr. Ahm[a]d, I apologize, had been negotiating fraudulent prescriptions at the Verree Pharmacy from a period, I believe, dating back to 2012 for a period of almost seven years. That's how long he was doing it. And the amounts that he was getting, the amount of pills or tablets in some cases were as much as 360 a month. But it wasn't just the amount –

Q. (Prosecutor) 360 what a month?

A. (Agent Gregory) Oxycodone tablets, I apologize. But it wasn't just the amount of tablets, it was the corresponding dosage units which were always, I believe, 30 milligrams. Both of those numbers seemed very, very high to me.
. . . .

*Appx. A.014*

Q. (Prosecutor) Please identify any red flags, or if you would like me to point, please tell me. . . .

A. (Agent Gregory) . . . The 240, again, I thought that was a high amount. . . .

*Appx. A.016*

Q. (Prosecutor) Okay. You said when you began your investigation with regard to Verree Pharmacy, you noticed high numbers of pills, such as 360; did you locate those prescriptions and those screenshots corresponding to those prescriptions?

A. (Agent Gregory) Yes.

Q. (Prosecutor) Okay. What was the regularly pairing of pharmacy and technician with regard to the 360 prescriptions that Mohammed Ahmad filled?

A. (Agent Gregory) Every one that I saw was the same. It was Todd Andrew Goodman as the pharmacist, and Eric William Pestrack listed as the pharmacy technician.

Q. (Prosecutor) Was there at least ten of those transactions in the year 2017?

A. (Agent Gregory) Yes.

Q. (Prosecutor) Did you find any in the year 2018?

A. (Agent Gregory) Five, I believe.

Q. (Prosecutor) Marking this a[s] JG-6, and JG-7; do you recognize JG-6--

From there, the prosecutor went on to show the agent and grand jury a prescription from 2018 marked as JG-6 (the prescription itself) and JG-7 (the screenshot of the pharmacy server data for the prescription). As the agent then testified, the prescription, which evinced numerous red flags, was filled by the defendants. Appx. A.017. And, as the agent testified and the prescription reflected, the amount of tablets written on the prescription was 240. *Id*. A.018; *see also* JG-6 and JG-7.

When viewed in context, the record reflects that, at worst, the prosecutor misspoke when she referenced "360 prescriptions." The evidence shows that there were "at least ten" transactions involving "high numbers of pills" (including transactions of 240 or more oxycodone pills) in 2017, and five such transactions in 2018. The prosecutor's minor misstatement was cured when she showed the grand jury a prescription example—JG-6 and JG-7—for 240 tablets. *See* Appx. A.017-018. Moreover, Agent Gregory confirmed that the "amount of tablets" on the suspect prescription was "240." *Id*. A.018. And, as Agent Gregory's testimony as a whole

19

reflects, 240 and 360 were both "high amount[s]" of pills—in other words, both numbers were red flags that caught investigators' attention.

The defendant also alleges that Agent Gregory falsely testified when he listed the drugs marked on exhibits JG-1A, B, C, and D. These exhibits were "four screenshots taken from the Verree Pharmacy computer of [M.P.'s] prescription record from 2018."[10] *Id.* A.051. When asked by the prosecutor to "list the drugs that were dispensed," Agent Gregory responded:

***Appx. A.051-052***

A. (Agent Gregory) Yes. In the first one, in 1A, would be oxycodone tablets, 30 mg, 100. The next one is methadone tablets, methadone 100 tablets, 10 mg a piece. The next one is Alprazolam, which is commonly referred to as Xanax, 1 mg tabs, 1,000 of those, and the final one is amphetamine, 20mg, 100 tabs. They're all from Dr. Stuart Kauffman.

The exhibits themselves—all of which were shown to the grand jury—reflect that the prescriptions were respectively for: "30 MG/TABS/100," "QtyW: 00150" (JG1A); "10 MG/TABS/100," "QtyW: 00150" (JG1B); "1MG/TABS/1000," "QtyW: 00045" (JG1C); and "20MG/TABS/100," "QtyW: 00060." Appx. A.087-A.090. The numbers 100, 100, 1000, and 100 shown on the screenshots referred to the bottle size (or the amount of pills that fit in each bottle). When Agent Gregory testified about the prescriptions, he read off this number, as opposed to the quantity of drugs dispensed, which appeared on the left of the prescriptions. Nonetheless, any misstatement—to the extent there was any—was cured by the fact that the government showed the screenshots of the pharmacy data concerning these prescriptions to the

---

[10] As discussed above, the government will be moving to dismiss Count Ten, which pertains to a prescription filled for patient M.P.

grand jury (exhibits JG1A-D). And each of these screenshots showed the precise quantity of pills dispensed.[11]

Even if the exhibits shown to the grand jury had not corrected the alleged errors in testimony, "misstatements or mistakes alone . . . are not sufficient to warrant a finding of misconduct or to justify dismissal of an indictment." *United States v. Fisher*, 871 F.2d 444, 450 (3d Cir. 1989) (collecting cases); *see also United States v. Smith*, 282 F. App'x 143, 148 (3d Cir. 2008) (upholding district court's refusal to dismiss an indictment based on defendant's allegation "that the indictment was founded upon materially false and improper evidence," including incorrect agent testimony); *Fisher*, 692 F. Supp. at 501 ("Dismissal of an indictment because of prosecutorial misconduct is appropriate only in particularly egregious or flagrant cases such as where the prosecutor knowingly submits perjured testimony to the grand jury. . . . Dismissal will not be appropriate, however, when there is no evidence of a deliberate attempt by the witness and the prosecutor to mislead."); *United States v. Blatt*, 2007 WL 3287397, at *7 (E.D. Pa. Nov. 5, 2007) (holding that even government's misstatement of law to the grand jury is not considered flagrant misconduct that would prejudice the defendant and warrant dismissal of the indictment). The government's minor misstatements do not come close to rising to the level of "flagrant" misconduct warranting the "extreme sanction" of dismissing an indictment. *Birdman*, 602 F.2d at 559.

Further, the defendant has failed to show that any error in testimony prejudiced the defendant. *See, e.g*, *Coppedge v. United States*, 311 F.2d 128, 132 (D.C. Cir. 1962), *cert. denied*,

---

[11] Notably, the defendant chooses to highlight that only 45 tablets and 60 tablets, respectively, were dispensed, cherry-picking two of the examples. Goodman Mot. at 10. The defendant conveniently ignores that the quantities filled for the remaining two prescriptions—150 and 150, respectively—were more than the numbers Agent Gregory read to the grand jury. Agent Gregory consistently read the bottle size number from the document displayed to the grand jury, belying the defendant's claim of government malfeasance.

373 U.S. 946 (1963) ("It is enough that there is *some* competent evidence to sustain the charge issued by the Grand Jury even though other evidence before it is incompetent or irrelevant in an evidentiary sense or even false." (emphasis in original)); *United States v. Sampson*, 2010 WL 1505904, at *4 (M.D. Pa. Apr. 13, 2010) (holding that there is no "basis for concluding that the Grand Jury's decision to charge Sampson with involvement in the August 1, 2007 transaction was materially influenced by the mistake in testimony"). This is particularly so here, where the relevant pharmacy server data shown to the grand jury cured any misstatement, and overwhelming testimony supported the lodged charges.

### E. Conclusion

In short, "it is well recognized that the remedy of dismissal of an indictment on grounds of prosecutorial misconduct is an extraordinary one." *Smith*, 282 F. App'x at 149; *see also Birdman*, 602 F.2d at 559 ("[T]he federal courts have clearly established the principle that the dismissal of an indictment on the basis of governmental misconduct is an extreme sanction which should be infrequently utilized."). Whether viewed alone or cumulatively, none of the purported errors flagged by the defendant warrants dismissing the indictment.[12] The defendant's motion should be denied.

### III.  **Disclosure of Rule 404(b) Evidence**

Next, the defendant requests that the Court order the government to immediately disclose (if not already disclosed in discovery) extrinsic evidence of any prior or other alleged acts by the defendants it intends to use at trial. *See* Goodman Mot. at 12. Furthermore, the defendant urges the Court to order the government to specifically state what extrinsic evidence it intends to use at

---

[12] No evidentiary hearing on the dismissal motion is warranted. There are no material issues of factual dispute. Moreover, and as discussed more fully above, the defendant has failed to show any prejudice from the alleged errors.

trial, either as evidence in its case-in-chief, impeachment evidence, or potential rebuttal evidence. *Id*.

The government has already disclosed evidence of prior or other alleged bad acts by the defendants in its discovery productions.[13] This includes evidence of the defendants' participation in the BBDF scheme, as well as evidence of defendant Pestrack's sexual advances on a customer of Verree Pharmacy, whom he would deliver drugs to at home in exchange for cash. The government does not presently intend to offer evidence that falls within the scope of Rule 404(b) in its case-in-chief at trial. Should the defendant kick open the door to extrinsic issues, the government would seek permission to potentially introduce Rule 404(b) evidence as impeachment or rebuttal evidence, providing reasonable notice to the defendant in accordance with the Rule. The Court's scheduling order dated May 16, 2023, provides that the government's trial memorandum and motions in limine are due on August 25, 2023. The government intends to address any potential Rule 404(b) issues in its August 25, 2023 filings, consistent with the Court's scheduling order.

Accordingly, given that the government has already disclosed any Rule 404(b) evidence and that the Court's scheduling order already sets a "reasonable notice" deadline, the defendant's request should be denied as moot.

## IV. <u>Production of Impeachment Material</u>

The defendant requests an order requiring the government to produce all impeachment material, including any records or information in law enforcement officers' personnel files. *See* Goodman Mot. at 13-15. The government recognizes its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny to turn over evidence favorable to the defense. The

---

[13] By contrast, despite the government's voluminous discovery productions, the defendants have failed to produce any reciprocal discovery altogether.

government has voluntarily done so in this case, fulfilling its *Brady* requirements. With respect

to the requested impeachment material, the government is aware of its responsibility under

*Giglio v. United States*, 405 U.S. 150 (1972), and its progeny to provide impeachment material

regarding its witnesses, including records or information in law enforcement witnesses'

personnel files. The government will provide any such material, if it exists, in advance of trial.

The defendant's request for an order for production of impeachment material should, therefore,

be denied as moot.

### V. Preservation of Rough Notes and Investigative/Draft Reports, and Disclosure to Court for Further Review

Lastly, the defendant requests that the Court order that all government agents preserve

their rough notes of investigation regarding this case, as well as preserve their drafts of reports

even if final drafts have been prepared. Goodman Mot. at 15-18. In addition, the defendant

requests that the Court order that the government turn over all such notes and draft reports for the

Court's review to determine if they should be produced to the defendant. *See id.*

Government agents are required to preserve rough notes of interviews with prospective

trial witnesses. *United States v. Vella*, 562 F.2d 275 (3d Cir. 1977). The government recognizes

its responsibility to request that federal government agents, as well as local law enforcement

officers involved in a federal investigation, retain rough notes pertaining to the investigation and

prosecution of the charged criminal activity.[14] Agent notes, however, are subject to production

---

[14] A state investigation preceded the federal investigation in this case. Specifically, on July 17, 2019, Agent Gregory received information from Lieutenant Dennis Rosenbaum, of the Philadelphia Police Department, concerning possible prescription fraud. Dr. J.E. had notified law enforcement that prescriptions for Schedule II controlled substances had been issued in his name and then filled at Verree Pharmacy. Agent Gregory initiated a state investigation into this potential fraud. On August 7, 2019, Agent Gregory obtained an arrest warrant for Mohamed Ahmad pursuant to evidence from the state investigation, including statements made by Pestrack and Spivack in July and August 2019. Agent Gregory had memorialized the contents of those statements into an affidavit of probable cause for Ahmad's arrest (dated August 7, 2019) and supplemental reports. Pursuant to Pennsylvania Office of

only if they constitute statements falling under the Jencks Act, or contain *Brady* material. *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994). In *Ramos*, the Third Circuit reaffirmed its prior directive that the government preserve all notes of interviews with witnesses in criminal cases. But it explained that this rule exists only to permit prosecutors, and then, if necessary, trial judges to review the notes to assure that no Jencks or *Brady* material is present in the notes. If no such material exists in the notes, the notes are not subject to disclosure.

The government will comply with its discovery and *Brady* obligations, and will produce any Rule 16, Jencks, or *Brady* material contained in interview notes before trial commences. Should the Court want to review any interview notes to determine whether they should be produced to the defendant, the government will make them available. Accordingly, the defendant's motion regarding rough interview notes should be denied as moot.

## VI.   Conclusion

In short, for the reasons described above, the defendant's pretrial motions should be denied.


Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*/s Joan E. Burnes / Eileen Castilla Geiger*
JOAN E. BURNES
EILEEN CASTILLA GEIGER
Assistant United States Attorneys

---

Attorney General protocol regarding investigations likely culminating in a state prosecution, any notes that may have been created in connection with those statements were destroyed once the information was transcribed into the reports. Law enforcement notes of witness interviews following the initiation of the federal investigation have been retained.

## CERTIFICATE OF SERVICE

I certify that I caused a copy of the Government's Response to Defendant Goodman's Pretrial Motions to be served by ECF on:

Rocco C. Cipparone, Jr., Esq.
Thomas B. Malone, Esq.

*/s Eileen Castilla Geiger*
EILEEN CASTILLA GEIGER
Assistant United States Attorney

Dated: August 3, 2023.