# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 22-435-1 |
| TODD GOODMAN | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Todd Goodman stands before the Court convicted of knowingly distributing and dispensing oxycodone, a dangerous and addictive Schedule II controlled substance, based on an obviously altered and forged prescription.   That prescription was one of dozens of obviously altered and forged prescriptions filled by Goodman and dispensed to cash-paying customers.   Through this illicit dispensing, Goodman violated his duties as a pharmacist and helped fuel the nation's growing opioid epidemic.

Relevant conduct shows Goodman engaged in criminal acts, together with his co-defendant and co-conspirators, for almost a decade, putting countless lives and his community at risk.   As an attorney, Goodman should have had a heightened respect for the law.   And as a pharmacist, he well knew that many prescriptions he was filling were forged, and that the combinations of drugs he cavalierly dispensed were dangerous.   Yet he chose to ignore blatant "red flags" and dispense them anyway.

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors, which support a sentence at the top end of the advisory guideline range of zero to six months' imprisonment, followed by a term of supervised release.   All of the appropriate considerations of sentencing show that such a custodial sentence is fully justified in this case.

# I. <u>BACKGROUND</u>

On December 1, 2022, a federal grand jury returned a nine-count indictment charging Goodman and his co-defendant Eric Pestrack with conspiring (with Mitchell Spivack)[1] to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count One), and distributing, and aiding and abetting the distribution of, controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(E) and 18 U.S.C. § 2 (Counts Two through Ten).   The charges arose from the co-conspirators' conduct at Verree Pharmacy, a small, corner pharmacy in the Fox Chase neighborhood of Northeast Philadelphia.   Spivack, a licensed pharmacist, owned and ran Verree.   Goodman was a part-time pharmacist at Verree, and Pestrack was the lead pharmacy technician at Verree.

Verree maintained a computer system to acquire, track, dispense, and bill for prescription drugs dispensed by the pharmacy.   Goodman, Pestrack, and Spivack logged onto Verree's computers with a login and password, and they would assign their initials to each activity taken. The pharmacy computer system thus recorded the initials of the pharmacist and technician who completed any action.   The computer system also maintained a patient profile record for each customer who filled prescriptions at Verree.

Verree cultivated a reputation as an easy-fill, no-questions-asked pharmacy for patients seeking to fill opioid prescriptions.   In fact, Verree became the top retail pharmacy purchaser of

---

[1] On June 29, 2022, Spivack waived indictment and pled guilty to an Information charging him with a two-prong conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, for conspiring to submit fraudulent claims to health care benefit programs and distribute medically unnecessary controlled substances outside the usual course of professional practice and not for a legitimate medical purpose.   *See* Case No. 22 Cr. 166.   Spivack's then-uncharged co-conspirators were his employees at Verree pharmacy: pharmacist Todd Goodman, and pharmacy technicians Eric Pestrack and L.K.   On October 11, 2022, Spivack was sentenced to 42 months' imprisonment, to be followed by two years of supervised release, and restitution in the amount of $278,566.33.

oxycodone, a Schedule II controlled substance, in Pennsylvania.   Verree filled so many opioid prescriptions that a long line of customers sometimes extended outside the pharmacy.

From at least 2012 through 2019, Goodman, Pestrack, and Spivack conspired to distribute controlled substances outside the course of professional practice and without a legitimate medical purpose.   As part of the scheme, the co-conspirators dispensed and distributed, and aided and abetted the distribution of, controlled substances based on obviously altered prescriptions for oxycodone.   They did so without verifying the forged prescriptions with the issuing physician and ignoring obvious "red flags."   Moreover, to avoid scrutiny by health care benefit programs which monitored the amount of opioids dispensed, the co-conspirators frequently required payment in cash for oxycodone prescriptions, even when the customer had insurance.

Specifically, from 2012 until 2019, Goodman and Pestrack filled forged oxycodone prescriptions for customers Mohamed Ahmad and his wife, Linda.   For years, Mohamed Ahmad would draw a line in the center of a valid prescription that a doctor, Dr. J.E., had written for him or his wife.   Mohamed Ahmad would then add in a forged oxycodone prescription, with falsified amounts and dosage units, on the right side of the prescription.   Mohamed Ahmad would try to get his forged prescriptions filled by Verree at times when Pestrack was working, as Pestrack would do "favors" for him, like occasionally filling his prescriptions early.

Altogether, the Ahmads paid more than $150,000 in cash for their altered prescriptions to be filled by Verree.   When Mohamed Ahmad presented a legitimate insurance card to pay for the oxycodone prescriptions, Pestrack urged him to pay in cash, advising that "insurance won't cover these . . . cash only, cash preferred."   Pestrack would put the cash that the Ahmads would give him for their forged prescriptions into his pockets.

On each of the dates below, for example, Goodman and Pestrack filled altered oxycodone prescriptions for the Ahmads:

| Approx. Date | Drug | Approx. Cash Payment | Overt Act or Count in Indictment |
|---|---|---|---|
| June 10, 2015 | 240 oxycodone 30 mg | $600 | Overt Act 1 |
| June 17, 2015 | 240 oxycodone 30 mg | $720 | Overt Act 2 |
| March 29, 2017 | 360 oxycodone 30 mg | $1,080 | Overt Act 3 |
| April 5, 2017 | 360 oxycodone 30 mg | $1,080 | Overt Act 4 |
| May 3, 2017 | 240 oxycodone 30 mg | $720 | Overt Act 5 |
| May 17, 2017 | 240 oxycodone 30 mg | $720 | Overt Act 6 |
| May 31, 2017 | 240 oxycodone 30 mg | $720 | Overt Act 7 |
| June 14, 2017 | 360 oxycodone 30 mg | $1,080 | Overt Act 8 |
| July 12, 2017 | 270 oxycodone 30 mg | $810 | Overt Act 9 |
| August 2, 2017 | 300 oxycodone 30 mg | $900 | Overt Act 10 |
| November 22, 2017 | 240 oxycodone 30 mg | $720 | Overt Act 11 |
| January 10, 2018 | 270 oxycodone 30 mg | $810 | Count 3 |
| March 21, 2018 | 240 oxycodone 30 mg | $720 | Count 4 |
| April 21, 2018 | 240 oxycodone 30 mg | $810 | Count 5 |
| May 26, 2018 | 240 oxycodone 30 mg | $820 | Count 6- Superseding Information Count 1 |
| June 20, 2018 | 240 oxycodone 30 mg | $820 | Count 7 |
| August 13, 2018 | 240 oxycodone 30 mg | $760 | Count 8 |
| September 5, 2018 | 240 oxycodone 30 mg | $820 | Count 9 |

The copies of these prescriptions and the corresponding patient profiles—including the May 26, 2018 prescription charged in the Superseding Information—are attached as Ex. A. As Ex. A shows, the Ahmad prescriptions bore blatant "red flags," including: obvious alterations and manipulations (such as names changed, and dates scratched off and scribbled over); two drugs on one paper prescription (including one non-controlled substance on the left side, and oxycodone added on the right side by forgery); exceptionally high doses of opioids; and/or cash payments ranging from $600 to over $1,000. Moreover, some prescriptions had "Rx" written on them instead of "Dx" for diagnosis codes, with forged diagnosis codes added. Despite these "red flags,"

Goodman and Pestrack did not ask any questions, and did not turn away the Ahmads. Nor did Goodman and Pestrack verify the obviously forged prescriptions with the doctor who allegedly prescribed the drugs, Dr. J.E. Had they contacted Dr. J.E. as required, he would have informed them that the prescriptions were forgeries.

Furthermore, the defendants attempted to conceal the fact that they were receiving cash payments for these prescriptions to avoid drawing regulatory attention. For example, the defendants included the notation "WC" (worker's compensation) on the receipts for the forged prescriptions—even though the Ahmads never told them about any worker's compensation claim. The defendants also logged into the Prescription Drug Monitoring Program ("PDMP") system that the prescriptions were being paid for by "commercial insurance," despite the cash payments.

In addition to their dispensing of forged prescriptions, Goodman and Pestrack also dispensed highly dangerous "Trinity Cocktail" prescriptions, consisting of a combination of an opioid, a benzodiazepine, and a muscle relaxant. Such combinations should have raised "red flags" that the prescriptions were not issued for a legitimate medical purpose and outside the course of professional practice.

From around January 2014 through December 2019, Rochester Drug Cooperative ("RDC") served as Verree's wholesale supplier of controlled substances. Verree's former supplier had stopped doing business with the pharmacy because of diversion concerns. RDC's compliance department urged Verree to create policies to prevent diversion of controlled substances by its customers, given RDC's concerns about Verree's opioid distribution. As a result, Verree created a "Due Diligence Procedure for Controlled Substances" to ensure that RDC would continue to supply oxycodone. Spivack, Goodman, Pestrack, and L.K. (a pharmacy technician at Verree) signed the

policy document dated August 1, 2016, confirming that they would enforce the procedures as written.   Despite their assurances, the Verree employees failed to adhere to the policies.   In November 2018, RDC notified Verree that it would impose a mandatory reduction in the amount of controlled substances that it would provide, due to ongoing concerns over the pharmacy's diversion practices.

Around the same time that RDC limited Verree's opioid supply, the defendants doubled down on their misconduct: they created a "Narc Members" club that required patients to pay "dues" to ensure that their prescriptions for oxycodone would be filled without question.   "Narc Members" typically paid the defendants monthly dues of between $25 to $100 in cash, in addition to their co-pays or the costs of their prescriptions if they paid in cash.   The defendants did not inform these customers that they were part of the "Narc Members" club.

On September 5, 2023, the government filed a one-count Superseding Information charging defendant Goodman with the misdemeanor offense of knowingly distributing and dispensing a mixture and substance containing a detectable amount of a Schedule II controlled substance, and aiding and abetting the same, in violation of 21 U.S.C. § 842(a)(1), (c)(2)(A), and 18 U.S.C. § 2, all arising from dispensing oxycodone, a Schedule II controlled substance, based on an altered and forged prescription.   The May 26, 2018 prescription is included among the prescriptions attached in Ex. A (p. 55; Bates USA-CRIM _ 048853, 55).

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentences

The total statutory maximum sentence on Count One of the Superseding Information, knowingly distributing and dispensing a mixture and substance containing a detectable amount of

oxycodone, a Schedule II controlled substance, based on an altered and forged prescription, and aiding and abetting the same, in violation of 21 U.S.C. § 842(a)(1), (c)(2)(A), and 18 U.S.C. § 2, is: one year of imprisonment, a one-year period of supervised release, a $100,000 fine, and a $25 special assessment.

B.    **Sentencing Guideline Calculation**

The United States Probation Office has prepared a Presentence Investigation Report ("PSR") that calculated advisory guidelines of zero to six months' imprisonment, based on an offense level of 2 and Criminal History Category of I since the defendant has no criminal history points.    PSR ¶ 89.

The government objects to the calculation of the offense level, and advocates for the application of a two-level increase, because defendant Goodman abused a position of trust and used a special skill, that is, his pharmacy license, in a manner that significantly facilitated the commission or concealment of the offense, under U.S.S.G. § 3B1.3.    Application of the special skill enhancement produces an offense level of 4 and a Criminal History Category of I, and no change in the advisory guidelines range.    The government supports application of that range.

Section 3B1.3 of the Guidelines instructs that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."    The Third Circuit has found that the first prong of this enhancement applied in a markedly similar context: a case involving a pharmacist dispensing fraudulent prescriptions.    *See United States v. Hsia*, 527 F. App'x 176, 180 (3d Cir. 2013).    The Court explained that "[t]o determine if [the defendant] is subject to the enhancement, we must determine (1) whether he was in a position of trust; and (2) whether he abused the position in a way that significantly facilitated his crime."    *Id*. at 180.    The Court upheld the district court's

conclusion that the defendant "occupied a position of public trust, and abused that trust in a manner that significantly facilitated his crime." *Id.* Namely, the defendant "held a position of public trust because the public expects that licensed pharmacists will comply with health and safety regulations for which they are responsible, and, by filling fraudulent prescriptions, [the defendant] abused this trust." *Id.* at 179-80. So too here. "As a licensed pharmacist, [Goodman] was relied on by the public to safely distribute prescription medication in accordance with relevant regulations, and in his position was able to engage in criminal conduct without supervision in a manner that was difficult to detect." *Id.* at 180.

Moreover, the enhancement under Section 3B1.3 also applies under the second prong of the Guideline provision. The Third Circuit has held that the following two factors must be present to support the application of the upward Guidelines adjustment for use of a special skill: "(1) the defendant possesses a special skill; and (2) the defendant used it to significantly facilitate the commission or concealment of the offense." *United States v. Tai*, 750 F.3d 309, 318 (3d Cir. 2014). Here, Goodman possessed a special skill as a trained pharmacist. As the presentence report notes in paragraph 76, Goodman was awarded a Bachelor of Science in Pharmacy degree in 1986 from Temple University. Moreover, Goodman's skill and credentials were the means by which he could participate in "knowingly distributing and dispensing . . . a mixture and substance containing a detectable amount of a Schedule II controlled substance." Without his special skill and training as a pharmacist, Goodman could not have knowingly dispensed the oxycodone based on an altered and forged invalid prescription. Further, as a trained pharmacist, Goodman should have known not to fill the altered prescription based on the obvious "red flags" the forged prescription bore.

Thus, Goodman's special skill was integral to his commission of the offense of conviction. *See, e.g., Tai*, 750 F.3d at 316 (upholding the district court's finding that the defendant used a special skill (as a highly trained doctor) to commit his crimes of mail and wire fraud in connection with claims for payment from a settlement trust); *United States v. Kyereme*, 371 F. App'x 292, 294 (3d Cir. 2010) (concluding that increase for using a special skill was warranted, given that the defendant's "technical knowledge of computers and Cisco products significantly facilitated his crimes"); *United States v. Naselsky*, 561 F. App'x 155, 161-62 (3d Cir. 2014) (holding that use of a special skill enhancement was warranted for defendant's sentence upon conviction for wire fraud, where defendant was a real estate attorney and used his special professional skills to broker two substantial real estate transactions, and then obtained additional compensation for his professional work in those matters).[2]

In addition to application of the special skill enhancement, the government supports the occupational restriction described in the PSR:    As a further special condition of supervised release or probation, the defendant shall not be employed as a pharmacist. Clearly there is a reasonably direct relationship between defendant's employment as a pharmacist and the conduct relevant to the offense of conviction; the restriction is reasonably necessary to protect the public; and the time frame and structure is the minimum extent necessary to protect the public.    *See* PSR Appendix A.

---

[2]  With two points added for the special skill enhancement, paragraph 53 should reflect that Goodman has a total offense level of 4.    Likewise, paragraph 89 should provide that Goodman has a total offense level of 4.

### C. The Court Should Consider Relevant Conduct In Determining Sentence

The defendant has objected to the inclusion of "surplusage" in the presentence report. The background information included in the "Offense Conduct" section in the report should not be excised. The conduct described in this section—including the health care fraud and distribution of controlled substances schemes at Verree Pharmacy—clearly qualify as conduct relevant to the offense of conviction. *See* USSG § 1B1.3. Moreover, this background information is germane to the Court's consideration of the nature and circumstances of the offense, and the defendant's history and characteristics. *See* 18 U.S.C. § 3553.

Courts have routinely upheld the inclusion of such relevant facts in a presentence report. *See United States v. Stevenson*, 325 F. Supp. 2d 543, 548 (E.D. Pa. 2004) (refusing to excise narrative of brutal assault from presentence report's "offense conduct" section, over the defendant's objection, because "[t]his event was clearly related to the offense conduct as it flowed directly from [the defendant] losing the position at Capital Specialty Mushroom, Inc. that enabled her to commit the bank fraud. In addition, her desire to conceal the fraud may have motivated the attack, so it provides additional context. Most importantly, this event certainly informs the Court's understanding of [the defendant's] character and capabilities."); *United States v. Oliver*, 985 F.2d 556 (5th Cir. 1993) ("[The defendant] argues that (but offers no evidence that) the presentence report was not reliable. He gives no reason why it was unreliable save his own conclusory denial of a single statement concerning his role in the relevant conduct. Presentence reports are considered reliable and may be relied upon by sentencing courts in making factual sentencing determinations. . . . Relevant conduct may clearly extend beyond the conduct necessary to the offense of conviction." (emphasis added)); *United States v. Ellis,* 20 F. App'x 199, 200 (4th Cir. 2001) ("In sentencing a

defendant, district courts are entitled to consider and rely on any information concerning the background, character, and conduct of a person convicted of an offense for the purpose of imposing an appropriate sentence. . . . Although a defendant may object to the content of a presentence report, without an affirmative showing that the information contained therein is inaccurate, a district court is free to adopt the findings of the [presentence report] without more specific inquiry or explanation.") (internal quotation marks and citation omitted).

Furthermore, in his sentencing memo, the defendant brazenly claims that "filling an invalid prescription for cash begins and ends when the prescription is filled." ECF 71, Goodman Sentencing Memo at p. 16. Not so. Clearly it is relevant conduct that Goodman himself dispensed hundreds of pills in return for cash to this *same* husband-wife duo based on obviously forged prescriptions in the months preceding and following that crime. *See* Ex. A. Clearly it is relevant conduct, and the Verree pharmacy server and computer would show, that the co-conspirators dispensed thousands more pills to this same customer, an admitted drug dealer, and his wife. *See* Ex. B. Finally, clearly it is relevant conduct that the defendants billed Medicare and other insurers for prescriptions that they did not dispense (the "BBDF" scheme), at the same time that they were liberally filling forged prescriptions. Both illicit acts show the defendants' unlawful dispensing and billing practices, and how the defendants acted in concert with one another to unlawfully enrich the pharmacy.[3]

---

[3] Further, Mohamed Ahmad and some of the "Narc Members" were tied to the "BBDF" conduct. Specifically, the defendants and Spivack included the "BBDF" notation in the system for prescriptions for two of the "Narc Members" (for C.M.'s prescription in 2019, and for S.H.'s prescription in 2017), and for a prescription for Ahmad (in 2013).

For these reasons, the facts contained in the "Offense Conduct" section concerning the BBDF and controlled substance distribution schemes at Verree should remain in the presentence report and be considered by the Court.

## III.    FACTORS PURSUANT TO 18 U.S.C. § 3553

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a sentence at the top of the final advisory range is appropriate in this case.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, this Court must also consider all the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5)

the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

In addition to being a pharmacist, Goodman is an experienced attorney. He, more than others, should have respect for, and commitment to, the laws of the United States, including the drug laws. As discussed below, the defendant's flagrant disregard for the law merits a term of incarceration.

Goodman's crime put at risk the health and safety of many individuals. As a trained pharmacist, who worked whenever owner/pharmacist Spivack was not working, Goodman had a duty and responsibility to ensure that dangerous and addictive controlled substances were dispensed only pursuant to valid medically necessary prescriptions. Goodman's decision to work, for over a decade, in an "easy fill," "no questions asked" pharmacy as a pharmacist boosted Verree's profits, but risked lives in the community.

In his sentencing memorandum, Goodman points to a lifetime of good works in the community. We do not dispute this support from his friends and family. However, it is also undisputed that Goodman was a trained attorney and trained pharmacist who used his skills to imperil lives and pump dangerous drugs into the community. As a Verree customer segment of pill seekers and drug dealers emerged, Goodman and Verree Pharmacy catered to them. When pharmacist Goodman was presented with obviously forged and altered prescriptions, he liberally dispensed these drugs, ignoring his pharmacist training and decades of experience that made clear

that such prescriptions were not for a legitimate medical purpose.   He knew what he was doing was illegal and dangerous, yet he did it anyway to fill the pharmacy's coffers.

While Goodman emphasizes that he "received only his pay for the work performed" (p.5), he ignores that as a pharmacist, Goodman had a duty to be a gatekeeper to help stem the tide of opioid addiction.   And as a trained and practicing attorney, he had a special duty to the law.   Instead, he used his pharmacy license to fuel the opioid epidemic, rather than protect the community he served. Verree filled so many prescriptions that sometimes customers would queue up outside of the pharmacy and around the block to pick up oxycodone.   And during the time the offenses were occurring, Verree faced increasingly heightened scrutiny from its controlled substances supplier, leading its distributor to reduce its controlled substances supply.   Yet Goodman and his co-conspirators' misconduct persisted.

In this case, the need for general deterrence is critical.   Our nation continues to battle an opioid epidemic.   From 1999-2021, nearly 645,000 people in the United States died from an overdose involving an opioid.[4]   And over 75% of the nearly 107,000 drug overdose deaths in 2021 involved an opioid.   Pennsylvania, in particular, has been particularly ravaged by this crisis. According to the Pennsylvania Attorney General's Office, the opioid and heroin epidemic is the number one public health and safety challenge facing the State.[5]   Obviously, pharmacists play a key role in combating this situation.   They have a duty to warn patients about the addictive nature of opioid drugs and a duty to prevent diversion by providing independent oversight.   Instead of helping battle the opioid scourge, as his duty required, Goodman perpetuated the crisis.   It is

---

[4] https://www.cdc.gov/opioids/basics/epidemic.html.
[5] https://local21news.com/news/local/there-is-one-area-where-pa-is-making-positive-strides-to-combat-the-opioid-epidemic.

imperative to send a strong, unequivocal message to him, and to other would-be pharmacist drug dealers, that such conduct will not be tolerated by this Court.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). The defendant is an educated man who can earn an honest living.

The Guidelines remain of significant importance in advising judges regarding appropriate sentences. Uniformity in sentencing should be a paramount goal to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible. Thus, the best way to avoid arbitrary sentencing disparity is to impose a sentence in line with the advisory guidelines range.

In sum, for all the reasons set forth in this memorandum, the government respectfully requests that this Court impose a custodial sentence at the top of the guidelines, which is fully justified by the seriousness of the offense and other 3553(a) factors.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*/s Joan E. Burnes*
JOAN E. BURNES
Assistant United States Attorney


*/s Eileen Castilla Geiger*
EILEEN CASTILLA GEIGER
Assistant United States Attorney

15

## CERTIFICATE OF SERVICE

I hereby certify that this Sentencing Memorandum has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

Rocco C. Cipparone, Jr., Esq.

*/s Joan E. Burnes*
JOAN E. BURNES
Assistant United States Attorney

DATED:  December 7, 2023