UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| The United States of America, | Docket #CR-22-435-1 (HB) |
| Plaintiff, |  |
|  | United States Courthouse |
|  | Philadelphia, PA |
| vs. | December 13, 2023 |
|  | 10:30 a.m. |
| Todd Goodman, |  |
| Defendant. |  |

..........................................................

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE HARVEY BARTLE III
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:          Eileen C. Geiger, Esq.
                            U.S. Attorney's Office
                            615 Chestnut St.-Ste. 1250
                            Philadelphia, PA 19106

For The Defendant:          Rocco C. Cipparone, Jr., Esq.
                            Law Offices of Rocco C.
                            Cipparone, Jr.
                            157 Bridgeton Pike-Ste. 200-320
                            Mullica Hill, NJ 08062

Audio Operator              Nicole Spicer

Transcribing Firm:          Writer's Cramp, Inc.
                            1027 Betty Lane
                            Ewing, NJ 08628
                            609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

## Index

|                              | Direct | Cross | Redirect | Recross | Further Redirect |
|------------------------------|--------|-------|----------|---------|------------------|
| **Witnesses For The Plaintiff:** |        |       |          |         |                  |
| **Witnesses For The Defendant:** |        |       |          |         |                  |

| EXHIBITS: | | Marked | Received |
|-----------|---|--------|----------|
| G-A | List of Prescriptions | 8 | |
| G-B | Oxycodone Pill Distribution | 15 | |

**SUMMATION BY:**

| | |
|---|---|
| Ms. Geiger | 11 |
| Mr. Cipparone | 32 |

**THE COURT:** Finding    45

```
 1                THE CLERK:  All rise.  Oyez, oyez, oyez.  All manner
 2       of persons having anything to say before the Honorable Harvey
 3       Bartle, III, Judge of the United States District Court in and
 4       for the Eastern District of Pennsylvania, may at present
 5       appear, and they shall be heard.  God save the United States
 6       and this Honorable Court.  Court is now in session.  Please be
 7       seated.
 8                THE COURT:  Good morning.  You may be seated.
 9                ALL:  Good morning, Your Honor.
10                THE COURT:  The Court has before it this morning the
11       Sentencing Hearing in the case of the United States of America
12       vs. Todd Goodman, criminal action #22-435-1.  I'll first hear
13       from -- Ms. Guiger, are you going to be speaking for the
14       Government?
15                MS. GUIGER:  Yes, Your Honor.
16                THE COURT:  All right.  I'll hear from you first,
17       and then I'll hear from Mr. Cipparone and then Mr. Todd
18       Goodman.  Yes, you may proceed.
19                MS. GEIGER:  Your Honor, as a threshold matter,
20       there are a few remaining objections to the Pre-Sentence
21       Report.
22                THE COURT:  Very good.  Let's talk about those.
23                MS. GEIGER:  Just to be clear, none of these
24       objections change the Guideline range of zero to six months
25       imprisonment.  The first objection is the Government believes
```

**1**     **that the abuse of trust or special skill enhancement under**

**2**     **section 3(b)(1.3) squarely applies here.  That's under either**

**3**     **prong of Section 3(b)(1.3).**

**4**          **The Defendant abused the position of trust and used a**

**5**     **special skill, that is, his pharmacy license, in a manner that**

**6**     **significantly facilitated the commissioner concealment of the**

**7**     **offense.  Without his skills, credentials, and training as a**

**8**     **pharmacist, Mr. Goodman could not have knowingly dispensed the**

**9**     **oxycodone based on an altered and forged invalid prescription.**

**10**    **His position of trust and special skill was thus integral to**

**11**    **the crime.  And we put the relevant cases in our Sentencing**

**12**    **Memo, and we incorporate those arguments herein.**

**13**              **THE COURT:  Mr. Cipparone, do you want to --**

**14**              **MR. CIPPARONE:  Yes, Judge.**

**15**              **THE COURT:  -- address that issue first?**

**16**              **MR. CIPPARONE:  Yes, Judge.  Thank you.  We**

**17**    **obviously oppose that.  The Probation Department considered in**

**18**    **response to the Government's position in the Pre-Sentence**

**19**    **Report as indicated in the addendum that this enhancement does**

**20**    **not apply.  I agree with the Probation Department's assessment**

**21**    **of that in the addendum to the PSR for the reasons that are**

**22**    **stated in the PSR.  I don't necessarily feel the need to**

**23**    **belabor those, as I feel that Probation did cover it**

**24**    **adequately.  But I'm happy to answer questions if the Court**

**25**    **prefers.**

1          THE COURT:  All right.  The Court finds that that
2     section of the Guideline does apply.  Mr. Goodman was a
3     pharmacist.  That's a skill that you have to be licensed.  You
4     obtain a degree for that.  So I will grant the Government's
5     motion.  All right.  Anything further on that?

6          MS. GEIGER:  Thank you, Your Honor.  Yes.  And the
7     second objection at issue is that Defense counsel has objected
8     to the inclusion of the background information in the Pre-
9     Sentence Report.  And there are two types of background
10    information at issue, Your Honor.  The first is the "Bill But
11    Don't Fill" or the BBDF scheme.  And that really isn't at
12    issue here.  The Government has no interest in a mini trial
13    either.

14         This sentencing today is not about the BBDF scheme.  And
15    the Government merely provided the information concerning the
16    health care fraud scheme at Verree to the Probation Office and
17    to the Court in the spirit of candor and transparency.  We
18    wanted to ensure that all relevant parties were privy to the
19    information uncovered as part of the Government's
20    investigation into Verree.

21         And as the Court already knows, Mitchell Spivack, the
22    pharmacy owner, pled guilty to a two-pronged conspiracy, and
23    one of the prongs was the healthcare fraud scheme, and one of
24    his coconspirators as part of that was Mr. Goodman.  The
25    second type of background information at issue concerns --

1            THE COURT:  Let's talk about that one first.

2            MS. GEIGER:  Sure.

3            THE COURT:  Mr. Cipparone?

4            MR. CIPPARONE:  Your Honor, as you know, I've

5    objected to the Pre-Sentence Report's --

6            THE COURT:  Right.

7            MR. CIPPARONE:  -- inclusion of that --

8            THE COURT:  Right.

9            MR. CIPPARONE:  -- information for some of the

10   reasons, actually, the Government just articulated.  Mr.

11   Goodman, I will say, was never charged with --

12           THE COURT:  Right.

13           MR. CIPPARONE:  -- BBDF.  It is prejudicial

14   information because this Pre-Sentence Report, while I

15   understand Your Honor can say, "I'm not considering it" --

16           THE COURT:  Right.

17           MR. CIPPARONE:  -- this follows him around --

18           THE COURT:  Yes.

19           MR. CIPPARONE:  -- including in subsequent potential

20   disciplinary proceedings with respect to his law license.  And

21   as you know, fraud allegations are looked at substantially

22   differently by licensing boards, especially for --

23           THE COURT:  Right.

24           MR. CIPPARONE:  -- attorneys.  So for those reasons

25   and the reasons that I, in more detail set forth in my

**1**     Sentencing Memorandum, I'd ask the Court to have those -- that

**2**     reference excised from the --

**3**               THE COURT:  Yes.

**4**               MR. CIPPARONE:  -- Pre-Sentence Report.

**5**               THE COURT:  I agree with the Defense.  I will --

**6**     that should be excised from the Pre-Sentence Report.  What

**7**     paragraphs are we speaking on, Mr. Cipparone just so it's

**8**     clear?

**9**               MR. CIPPARONE:  If I may, Your Honor, let me just

**10**    get back to my Sentencing Memorandum on that.  The overall --

**11**    there are references throughout the offense conduct or

**12**    background section, Your Honor.  But primarily, it looks like

**13**    Paragraphs 25 through 29 of the Report contain the references

**14**    to BBDF.  Those are the primary paragraphs.  I think they're

**15**    kind of interspersed throughout elsewhere.  But the key

**16**    paragraphs are 25 through 29.

**17**               THE COURT:  All right.  The Court will order the

**18**    Paragraphs 25 through 29 to be deleted from the Pre-Sentence

**19**    Report.

**20**               MR. CIPPARONE:  Thank you, Your Honor.

**21**               THE COURT:  All right.  Anything further on --

**22**               MS. GEIGER:  Yes, Your --

**23**               THE COURT:  -- preliminary matters?

**24**               MS. GEIGER:  Yes, Your Honor.  The second type of

**25**    background information at issue is information that the

1  Government has requested inclusion of in the Pre-Sentence

2  Report, and those are the other forged oxycodone scripts that

3  the Defendant dispensed to the Ahmeds (phonetic) over a multi-

4  year period.  That's wholly appropriate conduct for the Court

5  to consider under section 3553(a).

6       Again, there's no disagreement here as to the Guideline

7  range, and the Government isn't arguing that these other

8  forged scripts qualify as relevant conduct for purposes of

9  increasing the offense level.  Instead, the Government's

10 argument is that the scripts listed on Page 23 of the PSR,

11 which are the same ones contained in Exhibit-A attached to the

12 Government's Sentencing Memo, are appropriate for the Court to

13 consider to determine where exactly within the Guidelines the

14 Defendant's sentence should fall.

15       (Government's Exhibit-A previously marked for

16 identification)

17            MS. GEIGER:  Here, the Defendant pled guilty to one

18 representative count of knowingly dispensing oxycodone based

19 on an obviously altered and forged script to the Ahmeds.  But

20 the Defendant's distribution of these other forged scripts to

21 the same husband and wife duo.  The same husband and wife --

22 the same offense to which he pled guilty is appropriate for

23 the Court to take into account.  And the Defendant has had the

24 discovery containing this evidence for over a year.  And the

25 chart containing this evidence that was supplied to the Court

1    and to the Probation Office for ease and convenience provides

2    a snapshot of Verree's and particularly this Defendant's

3    dispensing practices.

4              THE COURT:  Mr. Cipparone?

5              MR. CIPPARONE:  Thank you, Your Honor.  Can I submit

6    that that information is not properly included in the Pre-

7    Sentence Report or considered by the Court as the Probation

8    Officer also found at Pages 23 and 24 of the addendum?  For

9    those reasons, I ask that it not be included.  And I do

10   disagree with the Government on a couple of points just now.

11   She indicated it was one representative count.  No, it's one

12   actual count.  That was the Plea Agreement the Government

13   made --

14             THE COURT:  Right.

15             MR. CIPPARONE:  -- with Mr. Goodman, and that's what

16   he pled guilty to.

17             THE COURT:  But it is relevant with respect to

18   sentencing for purposes of considering background information,

19   isn't it --

20             MR. CIPPARONE:  Yeah, I understand.  I --

21             THE COURT:  -- relevant conduct?

22             MR. CIPPARONE:   I understand, Your Honor, if you

23   consider broader information --

24             THE COURT:  Right.

25             MR. CIPPARONE:  -- than the one count of conviction.

1          THE COURT:  Right.

2          MR. CIPPARONE:  And I'm not suggesting that this was

3     a one off. I --

4          THE COURT:  Right.

5          MR. CIPPARONE:  I wouldn't, you know, begin to state

6     that.  That's not consistent with the evidence.  But when the

7     Government says, "We've had the chart, we've had the

8     discovery," again, I don't want to turn this into a mini

9     trial.  We were prepared to and preparing for trial.  As Your

10     Honor knows, we were getting very close --

11          THE COURT:  Right.

12          MR. CIPPARONE:  -- when this deal got struck --

13          THE COURT:  Right.

14          MR. CIPPARONE:  -- and a lot of those things would

15     have been contested.  I don't want to put the Court or the

16     Government or Mr. Goodman for that matter, at a Sentencing

17     Hearing, through a mini trial on that.  So while I understand

18     the Court can consider that there were other instances, I

19     think that chart should not be included in the Pre-Sentence

20     Report.

21          THE COURT:  That issue came up yesterday, did it

22     not?

23          MS. GEIGER:  It did, Your Honor.

24          THE COURT:  All right.  What was my ruling

25     yesterday?

1          MS. GEIGER:  Your ruling was that it wouldn't be in

2     the Pre-Sentence Report.

3          THE COURT:  That it would not be?

4          MS. GEIGER:  Yes, it would not be.  Yes, Your Honor.

5          THE COURT:  Oh.  I'm going to be consistent.

6          MR. CIPPARONE:  Thank you, Your Honor.

7          THE COURT:  That will be excluded also.  So what

8     paragraphs are we talking about there?

9          MR. CIPPARONE:  Actually, there, the Government was

10     trying to add additional --

11          MS. GEIGER:  Yes.

12          MR. CIPPARONE:  -- information in it.  So --

13          THE COURT:  Oh, I see.  Additional.

14          MS. GEIGER:  We just wanted to keep --

15          THE COURT:  Yes, I see.  Absolutely.

16          MS. GEIGER:  -- our position consistent.

17          THE COURT:  So it will not be added.  Thank you.

18          MS. GEIGER:  Thank you.

19          THE COURT:  All right.  You may proceed, Ms. Geiger.

20          MS. GEIGER:  Thank you, Your Honor, may I approach,

21     please?

22          THE COURT:  You may.

23          MS. GEIGER:  Thank you.

24       (Ms. Geiger approaching)

25          MS. GEIGER:  Your Honor, the Section 3553 (a)

1     factors warrant imposing a sentence at the top of the

2     Guideline range for the Defendant.  Turning first to the

3     nature and circumstances of the offense, here, the documentary

4     evidence shows that the Defendant, a trained and experienced

5     pharmacist and attorney, brazenly dispensed a high volume of

6     oxycodone pills based on forged scripts over the span of

7     several years.  The Defendant didn't fill just one forged

8     script for the Ahmed's, a husband wife duo, on one single day.

9     Rather, as Exhibit-A demonstrates, the Defendant for years

10    dispensed thousands of oxycodone pills in exchange for

11    thousands of dollars, all in cash, to the Ahmed household.

12        I want to first direct your attention to the first and

13    second pages of Exhibit-A.  All of the forged prescriptions on

14    this chart were filled by Mr. Goodman for the Ahmeds, and none

15    of the oxycodone prescriptions on this chart dispensed by Mr.

16    Goodman were prescribed by a doctor.  Instead, they were

17    forged by Mohammed Ahmed.

18        The high doses of opioids that Mr. Goodman liberally

19    dispensed is staggering.  Turning to the top of the chart, for

20    example, it shows that Mr. Goodman distributed a 30-day supply

21    of 240 oxycodone pills to the Ahmed household on June 10th,

22    2015.  Only 7 days later, he dispensed another 30-day supply

23    of 240 oxycodone pills to the Ahmed household.  Same with the

24    next two entries on that chart.  On March 29, 2017, Mr.

25    Goodman dispensed 360 pills to the Ahmed household in exchange

1    for over $1,000 in cash.  Only a week later, he dispensed
2    another 360 oxycodone pills to the Ahmed household again for
3    over $1,000 in cash.

4         The next three entries on the chart, the three entries
5    from May 2017, show that over the course of just one month, on
6    three separate occasions, Mr. Goodman dispensed 240 oxycodone
7    pills just to Mohammed Ahmed in exchange for $720 in cash each
8    time.  Mr. Goodman also ignored the blatant red flags that
9    these prescriptions bore.  I want to show you just a few
10   examples of these red flags.

11        If you turn to the prescription on Page 11 of Exhibit-A
12   that Mr. Goodman filled on April 5th, 2017, that prescription
13   shows Voltaren gel on the left side, and Voltaren gel is used
14   to relieve arthritis pain.  On the right side, "oxycodone 30
15   milligrams 360" is written in with odd quotation marks around
16   the words "oxycodone 30 milligrams."  Mr. Ahmed drew a line in
17   the center of that prescription to separate the Voltaren gel
18   from the oxycodone.  Two RX numbers were added to the left
19   hand side of that prescription when, in actuality, as any
20   pharmacist would know, those numbers should have been DX or
21   diagnostic codes.

22        The date on the prescription also appears to be altered.
23   On the bottom of the prescription, the words "three-week fill"
24   are added in.  The sticker on that prescription shows that it
25   was dispensed by TAG, the initials for Todd Goodman, and that

**1**   the prescription was billed to WC, or Workers' Compensation.

**2**   Similarly, if you turn to page 12, that next page, it shows a

**3**   screenshot of the Verree Pharmacy server for this

**4**   prescription, which again shows that the forged prescription

**5**   was filled by TAG, Todd Goodman, and EWP, Eric Pestrack, and

**6**   billed to WC, Workers' Compensation.  Yet Verree didn't bill

**7**   any of the Ahmed's oxycodone prescriptions to Workers'

**8**   Compensation.  Instead, the Ahmeds paid for this prescription

**9**   with over $1,000 in cash.

**10**       As another example, I want to show you the prescription

**11**   that forms the basis of Count 1 of the superseding

**12**   information, and that's on Page 55 of Exhibit-A.  That

**13**   prescription for 240 milligrams of oxycodone was filled by Mr.

**14**   Goodman on May 26th, 2018.  The left side of the script

**15**   contains a prescription for Voltaren gel, and again on the

**16**   right side, there's oxycodone 240 milligrams with a line down

**17**   the center.

**18**       Now, this script is filled with all types of chicken

**19**   scratch on it.  The date on that prescription is scratched off

**20**   with a line across it.  The left side of the prescription has

**21**   some codes on it with words scribbled over.  Even the name on

**22**   the prescription appears to be written over.  The next page,

**23**   the Verree Pharmacy server data shows that the prescription

**24**   was filled again by TAG, Todd Goodman.  And even though the

**25**   server shows that the notation that it was billed to WC or

**1**    **Workers' Compensation, the Ahmeds paid $820 in cash for this**
**2**    **prescription.**

**3**         **The instructions for this prescription are to take 2 30**
**4**    **milligram oxycodone tablets every 3 hours.  Now, a telephone**
**5**    **call to the alleged prescriber, Dr. Eschelman (phonetic),**
**6**    **would have alerted Mr. Goodman that the prescription had been**
**7**    **altered and forged.  Same for all of these prescriptions on**
**8**    **the chart.  But inexplicably, that's not what happened.  Mr.**
**9**    **Goodman never called Dr. Eschelman.  All of the forged**
**10**   **prescriptions on this chart were filled by Mr. Goodman.  And**
**11**   **that's only a snapshot of the forged scripts that Mr. Goodman**
**12**   **filled for this same husband and wife duo.  Mr. Ahmed had been**
**13**   **bringing forged prescriptions to Verree Pharmacy for oxycodone**
**14**   **since at least 2013.**

**15**        **If you turn to Exhibit-B that the Government included as**
**16**   **part of its Sentencing Memo, that shows all of the oxycodone**
**17**   **pills based on forged script that Verree dispensed to the**
**18**   **Ahmeds since 2014.**

**19**        **(Government's Exhibit-B previously marked for**
**20**   **identification)**

**21**             **MS. GEIGER:  And that's only the oxycodone that**
**22**   **Verree distributed to the Ahmed household.  Verree dispensed**
**23**   **dangerously high amounts of opioids to dozens of other drug**
**24**   **dealers and addicts over the years in Philadelphia.  It**
**25**   **distributed such staggering numbers of pills that Verree, a**

**1**  mom and pop shop, became the top retail pharmacy purchaser of

**2**  oxycodone in the state of Pennsylvania.  Pill seekers turned

**3**  to Verree because it was an easy fill, no-questions-asked

**4**  pharmacy, and Mr. Goodman contributed to that.

**5**       This brings me to another section 3553(a) factor, and

**6**  that's respect for the law.  Mr. Goodman was not only a

**7**  pharmacist.  He was also a trained and experienced attorney

**8**  who should have had a heightened respect for the law.  Yet he

**9**  flagrantly disregarded it.  We don't dispute the Defendant's

**10**  good works and the community support that he has.  But at the

**11**  same time, Mr. Goodman used his skills and training to pump

**12**  high quantities of dangerous drugs into the community.

**13**       I also want to note that Mr. Goodman, even though he only

**14**  worked at Verree part time, he didn't work there for just a

**15**  week or just a year.  He worked there for 16 years.  Mr.

**16**  Goodman was at Verree when the DA sent Verree a letter of

**17**  admonition in 2015 outlining the pharmacy's violations of the

**18**  Controlled Substances Act.  Mr. Goodman was there in August

**19**  2016 when Verree's supplier, RDC, had him sign a due diligence

**20**  policy because of ongoing diversion concerns at the pharmacy.

**21**  And he was there in 2018 when RDC reduced Verree's supply of

**22**  oxycodone due to these ongoing diversion concerns.  And yet,

**23**  Verree's and Mr. Goodman's filling of forged oxycodone scripts

**24**  for the Ahmeds persisted.

**25**       The sentencing goal of deterrence also supports imposing

1    a sentence at the high end of the Guideline range.  As Your

2    Honor is aware, the opioid epidemic is rampant in this

3    country, and it's particularly rampant in Pennsylvania.  As a

4    pharmacist, Mr. Goodman could have helped stemmy (phonetic)

5    this crisis and prevent the diversion of lethal drugs.

6    Instead of doing this as his duty required, Mr. Goodman

7    perpetuated the opioid epidemic, cavalierly dispensing

8    oxycodone based on forged scripts.  A custodial sentence would

9    send a message to the Defendant and other white-collar

10   criminals that this conduct won't be allowed.

11        In sum, for all of these reasons, the Government urges

12   the Court to impose a sentence at the high end of the

13   Guideline range, as well as a term of supervised release with

14   an occupational restriction prescribing the Defendant from

15   working as a pharmacist.  Thank you, Your Honor.

16             THE COURT:  Thank you.  Mr. Cipparone?

17             MR. CIPPARONE:  Thank you, Your Honor.  With Your

18   Honor's permission, could I present the character witnesses

19   first --

20             THE COURT:  Absolutely.

21             MR. CIPPARONE:  -- and I'll speak after them?

22             THE COURT:  Absolutely.

23             MR. CIPPARONE:  I would start with David Kuritz, K-

24   U-R-I-T-Z.

25             THE COURT:  You may come forward.  He may come to

1    the podium, Mr. Cipparone.

2              MR. CIPPARONE:  Thank you, Your Honor.

3              THE COURT:  Ms. Spicer, will you please swear in the

4    witness?

5              DAVID KURITZ, DEFENDANT'S WITNESS, SWORN

6              THE CLERK:  Thank you.

7              THE COURT:  Mr. Cipparone?

8              MR. CIPPARONE:  I believe Mr. Kuritz is going to

9    speak in a narrative form to Your Honor.

10             THE COURT:  Whatever.  All right.

11             MR. CIPPARONE:  (Inaudible).

12             THE COURT:  Very good.

13             MR. KURITZ:  Thank you.  Good morning, Your Honor.

14             THE COURT:  Good morning.

15             MR. KURITZ:  My name is David Kuritz.  I'm an

16   attorney, a member of the bar of this Court, as well as the

17   Pennsylvania, New Jersey, and Florida bars.  I've been a civil

18   litigator for over 40 years, started my own firm 23 years ago,

19   and I have never been sanctioned or disciplined in any manner.

20        Listening to what the U.S. Attorney {sic} Office said in

21   their description of the background information of Todd

22   Goodman is not the Todd Goodman I know.  And I've had the

23   privilege of knowing Todd Goodman, first personally and then

24   professionally, for more than 20 years.  With so many others

25   having written letters on his behalf, Judge, I'm honored that

**1**   Todd has accepted my offer to speak on his behalf here today.

**2**       Driving over here this morning, Judge, I was angsting, as

**3**   I do when I'm getting ready to try one of my own cases, over

**4**   how to convey to you who Todd truly is.  And as often happens,

**5**   the simplest answer, at least in the drive over, seemed the

**6**   best.  Todd's surname says it all.  He is a good man.  While

**7**   he may not have chosen that name, Judge, I'm here to tell you

**8**   I have personally witnessed him living up to that name for as

**9**   long as I have known him.

**10**      Now, some may say that Todd's guilty plea in this matter

**11**  belies that description.  In fact, it does not.  Even good men

**12**  make mistakes.  But a good man owns up to his mistakes and

**13**  accepts responsibility, and that's what Todd has done.  And,

**14**  Your Honor, I'd like to take a minute to just tell a short

**15**  story that might help you get a better idea of who Todd really

**16**  is.

**17**      I might also suggest that he learns from his mistakes.

**18**  He doesn't repeat them.  Of course, there's no perfect

**19**  analogy, Judge, because nothing like this has ever happened in

**20**  Todd's life before, and these events were so out of character

**21**  for him.  But I do recall an experience many years ago that

**22**  will help, I believe, the Court to get a better picture of

**23**  this man.

**24**      As you may recall from my letter, our sons grew up

**25**  together, the same small community right outside of

**1**   **Philadelphia.  Todd donated an incredible amount of his time**

**2**   **to the local youth sports organization where the kids played**

**3**   **little league, not the least of which was volunteering his**

**4**   **time over and over again as a coach.  And in my letter, I**

**5**   **described to you how Todd started a community travel sports**

**6**   **league for the boys and girls who wanted that opportunity**

**7**   **despite some pretty fierce opposition from the local**

**8**   **association.**

**9**   **And Todd didn't set out to take on the local youth sports**

**10**  **authority, Judge.  In fact, he was a bit of an idealist.  He**

**11**  **believed that the only thing that mattered is what was good**

**12**  **for the kids.  It never occurred to him that offering those**

**13**  **boys and girls the opportunity to play travel sports, like**

**14**  **other communities had, would be seen as a threat by the**

**15**  **existing board of directors of the local association.**

**16**  **And he went ahead and brought his proposal to a board**

**17**  **meeting, volunteering both his time and his experience, to**

**18**  **make youth travel sports part of the existing organization.**

**19**  **And he was promptly voted down.  Todd made the mistake of not**

**20**  **counting the votes in the room before he made his proposal.**

**21**  **After all, in his mind, and this is who Todd is, how could**

**22**  **anyone not want to do what was best for the kids?**

**23**  **That was over 20 years ago, Judge.  Todd has never made**

**24**  **that mistake again.  He learns from his mistakes.  And**

**25**  **eventually, the travel sports organization that Todd built**

1    from scratch was so successful.  It was welcomed back by the
2    community association, the best description be as a conquering
3    hero.

4         To this day, there are hundreds of now grown boys and
5    girls and their families who got to have that experience
6    because of Todd's selflessness and his willingness to learn
7    from his mistakes and his determination to do what was best
8    for the community.  That has been Todd as long as I have known
9    him.

10        Your Honor, I am so confident from all I know that this
11   is not who Todd is.  I intend to stand behind that opinion
12   with more than just these words.  As you know, Todd has worked
13   as a litigator at my law firm for approximately 10 years,
14   mostly with me.  Todd's work has been exemplary in every way,
15   ethically, above all else.  In fact, the one thing my partners
16   and I struggle with the most is who's going to get more of
17   Todd's time.

18        There has never been a whiff of controversy over his
19   practice.  We have no concerns in that regard.  We see Todd
20   for the good man and excellent attorney that he is, and we
21   choose not to define him by this process.  I hope you are able
22   to do the same here today.

23        We understand, Judge, and we expect that there will be
24   some form of discipline from the Bar Association.  Todd self
25   reported to both the PA and New Jersey bars as soon as this

**1** Plea Agreement was reached, and I suspect those disciplinary

**2** boards are waiting for the result of this Sentencing Hearing

**3** before deciding Todd's future as an attorney. My partners and

**4** I very much want to continue Todd's employment following your

**5** decision and the decision of the bars. I sincerely hope Your

**6** Honor will take this into consideration and exercise your

**7** discretion to not send Todd to jail, which I just heard is

**8** within the Guidelines. The difference between a prison

**9** sentence and something less may well be the difference between

**10** disbarment and suspension.

**11**      As I understand it, Todd has already voluntarily accepted

**12** multiple punishments, not only the cost of his defense in this

**13** matter, but the civil penalty that he's already paid, the loss

**14** of his pharmacy license, the negative publicity associated

**15** with both the civil and criminal complaints filed against him,

**16** and now a federal record that will stay with him for the rest

**17** of his life. While there is no doubt both bars will also

**18** punish him, my partners and I do not believe Todd deserves

**19** disbarment for this unrelated transgression to his many, many

**20** good years of work as an attorney.

**21**      Though probably unnecessary, Your Honor, based on

**22** everything I know about Todd Goodman, I stand here today and

**23** offer to personally supervise his work as an attorney at my

**24** firm for as long as he agrees to be there. I am willing to

**25** take on that responsibility. That's how much I believe in

1    this man.  And a sentence less than jail time is all that
2    might take to make that possible.  So I'm asking Your Honor to
3    keep that in mind within your discretion, within the
4    Guidelines, before finalizing Todd's sentence here today.

5    Your Honor, I also heard the background information that
6    was read to the Court.  And I think if you'll allow me just a
7    couple of more minutes, it's important to share some
8    background information that I am personally aware of through
9    my interactions with Todd that you may not be aware of.

10   Long before these events unfolded, Todd would often
11   confide in me how frustrated he was by the daily battle to
12   help customers who truly needed their pain medication for
13   legitimate medical reasons to fit within the difficulties
14   involved in fighting the opioid epidemic.  Before any of this
15   happened, he would tell me about time-consuming calls to the
16   doctor's office to try to confirm that customers were being
17   prescribed opioids for a legitimate medical reason, and there
18   were many customers that needed their medicine for those
19   legitimate medical reasons.

20   He was sincere in his efforts from all I could read in
21   making sure -- trying to make sure that those prescriptions
22   were legitimate.  In fact, Your Honor, Todd would use his
23   personal time to visit doctors' offices when he had questions,
24   to look over the facility, to talk to the administrative
25   staff, and even speak with the doctor, doing whatever he could

1    to be comfortable, that when that doctor's patients came into
2    the pharmacy with an opioid script, that their pain medicine
3    was needed for a legitimate medical purpose.  He did this so
4    many times, Your Honor.

5         I recall telling him, "Todd, if you ever walk into an
6    office where you suspect there's a pill mill going on, get the
7    hell out of there.  Don't try to be a hero and confront
8    anybody."  He would ask me about a specific physician, Judge,
9    because I worked with a lot of doctors in my practice as a
10   civil litigator.  He'd ask if a certain physician that had
11   sent a patient in for an opioid prescription was familiar to
12   me, did I have any opinions about that doctor, should he be
13   concerned about the practice?  And I would share with him what
14   I knew in that regard if I happened to know who that
15   particular physician was.

16        The point, Your Honor, is Todd made it clear to me that
17   he was doing everything he could to make sure that the
18   prescriptions he filled were, in fact, for a legitimate
19   medical need.  That's what makes this so difficult, in my
20   opinion, to evaluate.  It represents the exact opposite of who
21   I know Todd to be.  The action -- the decisions that are
22   involved in this case that Todd agreed to admit to stand in
23   opposition to an otherwise unblemished career, completely
24   uncharacteristic of his commitment to ethics and a lifetime of
25   both service and integrity.

1    I hope that in addition to the background information

2    presented by the Government, the Court will consider the

3    background information that I have just provided from my own

4    personal experience with Todd and find a way to balance that

5    against this case when making your decision regarding sentence

6    here today.

7    Your Honor, as you probably know, being a successful

8    trial attorney takes a certain skill set, and one of those

9    skills, I believe, for lack of a better term, is the ability

10   to read people, from my clients, to Defendants, to jury

11   members, and even, in some cases, to the Court itself.  I have

12   read and know Todd Goodman.  The Government does not know the

13   man.  They know this case.  They don't know the man.  He is,

14   in fact, a good man.  He has faced heavy penalties already, as

15   I mentioned.

16   A sentence of no prison time, I just heard, is, in fact,

17   within the Guidelines.  I would ask the Court to consider that

18   when imposing this sentence here today and consider the

19   background information I've provided and enter a sentence of

20   something less than prison time.  Thank you, Your Honor.

21             THE COURT:  Thank you for coming.

22             MR. CIPPARONE:  Your Honor, there's one

23   additional --

24             THE COURT:  Sure.

25             MR. CIPPARONE:  -- character witness, Amy Titus, T-

```
 1   I-T-U-S.

 2              THE COURT:  You may.

 3              MR. CIPPARONE:  Your Honor, when Ms. Titus is

 4   finished, can we take a two minute bathroom break, if you

 5   don't mind, when she's done?

 6              THE COURT:  Sure.  You want to do it first?

 7              MR. CIPPARONE:  Whenever Your Honor --

 8              THE COURT:  We'll do it now.  Take a two minute --

 9   yes.

10              MR. CIPPARONE:  Do you mind?  I'm sorry.  Thank you.

11              THE CLERK:  All rise.

12         (Recess)

13              THE CLERK:  All rise.

14              MR. CIPPARONE:  Thank you, Your Honor.

15              THE COURT:  You may be seated.

16             AMY TITUS, DEFENDANT'S WITNESS, SWORN

17              THE CLERK:  Would you please state and spell your

18   name for the record?

19              MS. TITUS:  Yes.  My name is Amy Titus, A-M-Y T-I-T-

20   U-S.

21              THE CLERK:  Thank you.

22              THE COURT:  Good morning.

23              MS. TITUS:  Good morning, Judge Bartle.  I am not an

24   attorney.  I am a friend.  And I appreciate you giving me the

25   opportunity to share a few words with you about my friend,
```

1    Todd Goodman.  I hope that you've had a chance to read my
2    letter.
3              THE COURT:  I've read all the letters --
4              MS. TITUS:  Good.  So then --
5              THE COURT:  -- including yours.
6              MS. TITUS:  -- you will know -- you would know how
7    much Todd means to my family and to me.  I have been blessed
8    to know Todd for 13 years.  During this time, our families
9    have spent a lot of time together, so I feel like I really
10   know Todd well.  It's easy for me to speak about a person whom
11   I have an immense amount of respect, and I admire him greatly.
12       Todd is a man of exemplar character.  Character is hard
13   to define in itself, but you know when someone has it.  It
14   includes being kind, honest, loyal, trustworthy, and
15   dependable.  Todd has all of these qualities and more.  I have
16   learned so much by watching and listening to him interact with
17   people over the years.
18       During Todd's time as my son's baseball coach, I saw how
19   impactful his leadership and guidance was for the athletes on
20   his team.  He taught the kids that there's more to the game
21   than winning.  He stressed the importance of sportsmanship,
22   fairness, and respect for the officials.  He always had a
23   positive attitude and provided encouragement for all of his
24   players.  Several of his former team members still reach out
25   to him for advice and guidance, and they know they will always

 1    receive sound direction and infinite wisdom.

 2         The love that Todd has for his family is immense.  He is

 3    a caring and compassionate son to his mother, Rhoda, a loving

 4    and respectful husband to his wife, Renee, a role model for

 5    his sons, Ross and Lance, and a dependable and supportive

 6    brother, brother-in-law, and uncle to his many family members.

 7    Todd is the rock of the Goodman family and he is dedicated to

 8    their safety, to their happiness, and to their well being.  My

 9    sons and I are fortunate to be extended members of their

10    family, as they embrace us in love, too.

11         When it comes to friends, there is none better than Todd

12    Goodman.  He is someone I have been able to count on through

13    thick and thin.  He is an attentive listener and a superb

14    advisor.  When my husband suddenly and unexpectedly passed

15    away in 2019, Todd was by my side to help me make difficult

16    decisions.  He provided a shoulder to lean on during the most

17    challenging time of my life.  I will forever be grateful for

18    the love and support he showed to my sons and me during those

19    dark days.

20         Todd gives, but he asks for nothing in return.  He does

21    the right thing because it's the right thing to do, not for

22    praise, not for reward, not with the expectation of

23    reciprocation.  He has a heart of gold.  I have met a plethora

24    of people during my 25 years as a military spouse, but I had

25    never known anyone as kind, caring, intelligent, and gracious

1  and generous as Todd.  I am lucky to have him in my life.

2  Some friends will come and will go over time, but I know that

3  Todd will be my friend forever and I will always be grateful

4  for his friendship.

5      My trust in Todd is unshakable.  I accept that he has

6  pled guilty to the charges filed against him, but that will

7  never change the way I feel about my friend.  I am confident

8  that Todd will continue to make this world a better place by

9  serving his family, his friends, and his community.  I hope

10  that you will consider the most lenient sentencing possible in

11  this case so that Todd can move forward in a positive

12  direction.  Thank you, Judge.

13          THE COURT:  Thank you for coming, Ms. Titus.

14          MR. CIPPARONE:  Your Honor, can I present Mr.

15  Goodman?  And then I'll speak after him, if that's okay.

16          THE COURT:  You want to do it that way?

17          MR. CIPPARONE:  Yeah.

18          THE COURT:  All right, you may.

19          MR. CIPPARONE:  Thank you.

20          THE COURT:  Ms. Spicer, please affirm him in.  You

21  can stay up there.

22              TODD GOODMAN, DEFENDANT, SWORN

23          THE CLERK:  Thank you.

24          THE COURT:  Before you speak, Mr. Goodman, I want to

25  ask you if you've read the Pre-Sentence Report.

**1**          MR. GOODMAN:  I have, Your Honor.

**2**          THE COURT:  Have you discussed it with your

**3**    attorney?

**4**          MR. GOODMAN:  I have, Your Honor.

**5**          THE COURT:  Do you have any objections to the report

**6**    other than those raised by your attorney?

**7**          MR. GOODMAN:  None other than my attorney.

**8**          THE COURT:  And this is now your opportunity to

**9**    address the Court, to advise me about anything you think I

**10**   should know about you and your circumstances before I

**11**   determine what sentence to impose.

**12**         MR. GOODMAN:  Yes, I appreciate that opportunity,

**13**   Your Honor.  Thank you.  I know you have my written statement,

**14**   so I'm going to be brief.

**15**         THE COURT:  I've read your statement and all the --

**16**         MR. GOODMAN:  And I --

**17**         THE COURT:  -- letters and the Pre-Sentence Report.

**18**         MR. GOODMAN:  And I appreciate that.  But I wanted

**19**   the chance -- excuse me.  I wanted the chance to apologize in

**20**   open Court.  I wanted the chance to apologize to the Court, to

**21**   my community, to my friends, and my family who are all here

**22**   today.  Your Honor, may I just turn my back on you a minute

**23**   to --

**24**         THE COURT:  Sure.

**25**         MR. GOODMAN:  -- address my wife?  My wife, Your

**1**    Honor, of 33 years, I want to apologize to her.  I've brought

**2**    nothing but misery and stress to our household these last two

**3**    years.  I've risked our future and our happiness.  I am

**4**    responsible for us having to sell our family home of 30 years.

**5**    I have caused financial hardship.  I have lost my ability to

**6**    practice pharmacy, which I loved, and my ability to practice

**7**    law as an attorney, which I need, is in great jeopardy.

**8**       My wife is one in a million.  And again, I just want to

**9**    apologize to her and my family and my friends.  But, Your

**10**   Honor, I am solely responsible for this.  When I needed my

**11**   character most, I failed.  When I needed my honor, it was not

**12**   there.  And I will have to live the rest of my life with that.

**13**   I will spend the rest of my life rebuilding my character,

**14**   regaining my honor.  And it will take a long time, but I'm

**15**   going to spend every single day, every single minute, doing

**16**   that.

**17**       One promise I can make is you, Your Honor, or any other

**18**   criminal court will never see me again.  I am a proud father

**19**   of two boys, Ross and Lance.  They are gentlemen with the

**20**   utmost integrity.  I want to apologize to them for letting

**21**   them down.  They deserve better from me.  But I've taught my

**22**   kids that when you do something wrong, you take responsibility

**23**   for that wrong, you correct it if you can, and then you accept

**24**   the consequences of your actions, which I am prepared to do

**25**   here today.

1      I understand it is my actions that have brought me here

2   and again, there's nobody else to blame but myself.  As an

3   adult, Your Honor, all I've ever wanted to do was help people.

4   It was never my intention to hurt anybody or harm anybody.  I

5   haven't personally gained or profited at all in this matter.

6   But my actions were irresponsible, and they were wrong.

7      I will regret from the rest of my life not standing firm

8   with my values and not doing what I knew to be right.  I hope,

9   Your Honor, when considering my sentence, will consider the

10  totality of my life.  I hope that you will consider all the

11  good that I have done and all the good that I will do in the

12  future.  Thank you for this time, Your Honor.

13             THE COURT:  Thank you.  Mr. Cipparone?

14             MR. CIPPARONE:  Thank you, Your Honor.  Those are --

15  I don't want to use the word "difficult acts" to follow

16  because they're not acts, but, you know, they were, you know,

17  important words.  And a lot of what I said was already what I

18  was already -- what I was going to say, I should say, was

19  already addressed by some of those -- each of those three

20  previous speakers.  So I'm going to try to be compressed to

21  some extent and not be redundant of either my Sentencing Memo,

22  which I know Your Honor has read.

23             THE COURT:  I've read the Sentencing Memos, both

24  yours and the Government's.

25             MR. CIPPARONE:  And I'll try not to be, although of

1    necessity and maybe a little bit redundant, of some of the
2    speakers.

3           THE COURT:  Take your time.  This is an important
4    matter.

5           MR. CIPPARONE:  I'm going to address the 3553 -- as
6    Your Honor knows from my Sentencing Memorandum, I am
7    requesting a probation sentence for Mr. Goodman, which is
8    within the Guidelines and I'd submit is a sufficient but not
9    greater than necessary sentence in this particular instance.
10   And I'll address the key 3553(a) factors that I think apply
11   here, although there are others that I addressed in the
12   memorandum that I may skip over because they're addressed
13   adequately there.

14         As the Government did, I'll start with the nature and
15   circumstances of the offense.  And I don't make any excuses.
16   I don't suggest that this was a one off.  It did occur over a
17   period of time, notwithstanding that Mr. Goodman pled guilty
18   to the one prescription.  He's acknowledged that.  I
19   acknowledge that, and I'm not attempting to suggest otherwise
20   to the Court.

21         What I do submit to the Court, though, is that conduct,
22   including the background or relevant offense conduct, not in
23   the term of art of the Guidelines but the background conduct,
24   is aberrational and was aberrational for Mr. Goodman.  I think
25   that's evident from the fact that he's 60 years old and has no

**1**  **prior record.  He otherwise lived an exemplary life, as**

**2**  **attested to by the character letters and the persons,**

**3**  **including Mr. Goodman, who spoke today, and by the other**

**4**  **information that's set forth in the Pre-Sentence Report.**

**5**  **One of the things, as we were preparing for trial before**

**6**  **this was resolved by way of the guilty plea, is, of course, I**

**7**  **went through the discovery.  And I noted that of the**

**8**  **approximately -- I'm going to say 15 or 16, somewhere in**

**9**  **there, witness or, you know, anticipated Government witness**

**10**  **statements and interviews that I reviewed, none of those**

**11**  **patients or customers, I guess I will say from the pharmacy's**

**12**  **perspective --**

**13**  **THE COURT:  Right.**

**14**  **MR. CIPPARONE:  -- spoke directly of Mr. Goodman.**

**15**  **None of them, to my recollection at least, had more than**

**16**  **passing interaction with Mr. Goodman.  And I don't draw these**

**17**  **contrasts to throw other people under the bus.  I know Mr.**

**18**  **Spivack and Mr. Pestrack have already been sentenced by the**

**19**  **Court, but I do think it's important to distinguish Mr.**

**20**  **Goodman from them from a sentencing parity perspective, to**

**21**  **some extent.**

**22**  **I'm, of course, aware of the sentence Your Honor imposed**

**23**  **on Mr. Spivack, but that was to substantially more serious**

**24**  **charges and substantially different circumstances, especially**

**25**  **with respect to the financial gain --**

1           THE COURT:  Right.

2           MR. CIPPARONE:  -- by Mr. Spivack.  And Mr. Pestrack

3      was sentenced yesterday, I understand, by -- to three months

4      by Your Honor.  I think Mr. Goodman does stand in positive

5      contrast to them, I should say.

6           Notwithstanding his conduct, almost all of those persons

7      interviewed that I read spoke of Mr. Pestrack as being the

8      conduit primarily to their offenses.  He had been at the

9      pharmacy for 30 years, and I think from what I heard

10     anecdotally at least yesterday, the Government consistently

11     referred to Mr. Pestrack as the face of Verree Pharmacy.  That

12     was not Mr. Goodman.  He was a one-and-a-half to sometimes

13     two-day-a-week fill-in pharmacist for Mr. Spivack.

14          He earned -- obviously, he worked there 16 years, so his

15     income varied -- but somewhere between 40 and 55, or $60,000 a

16     year for that part-time work.  His earnings were commensurate

17     with what a small pharmacy pharmacist would make, meaning he

18     wasn't paid any enhanced income to engage in this conduct.

19     There was no cash described as being stuffed in his pockets.

20     I don't know where that cash ultimately went that was stuffed

21     in others' pockets, but it certainly wasn't to Mr. Goodman or

22     stuffed in his pockets.

23          And I don't think there's any dispute by the Government

24     that all Mr. Goodman got for working at the pharmacy,

25     regardless of whatever his conduct was, was his fair pay as a

**1**   **pharmacist for the hours that he worked in comparative to, for**

**2**   **example, what he might have earned at bigger pharmacies.  He**

**3**   **was probably underpaid in terms of if you look at the scales**

**4**   **of working at a CVS or a Walgreens as opposed to a community**

**5**   **pharmacy.**

**6**   **And again, I don't say that to denigrate other persons.**

**7**   **I'm not their lawyer, and that's not my job.  But my job is to**

**8**   **explain to the Court why I think there is an appropriate**

**9**   **sentencing disparity in this particular case, and that**

**10**  **sentencing Mr. Goodman to probation would not do any**

**11**  **disservice to either sentencing parity or general deterrence.**

**12**  **I don't want to be presumptuous and assume that the Court is**

**13**  **not concerned about specific deterrence of Mr. Goodman.  I**

**14**  **would proffer to the Court I don't think it needs to be**

**15**  **concerned about future specific deterrence of Mr. Goodman.**

**16**  **And unless the Court wants me to, I will not spend a lot of**

**17**  **time with respect to specific deterrence.  But I understand**

**18**  **that general deterrence is also a significant factor for the**

**19**  **Court to consider.**

**20**  **And in that regard, and Mr. Kuritz addressed this to some**

**21**  **extent, I'd asked the Court to consider several things.**

**22**  **Although Mr. Goodman did hold professional licenses and is at**

**23**  **least, you know, on a conscious or subconscious level, held to**

**24**  **a higher standard maybe because of those licenses, each of**

**25**  **those licenses are impacted by his conviction as collateral,**

1    but nonetheless collaterally punitive consequences.

2         He clearly is going to lose, and, as part of the Plea
3    Agreement, is forfeiting his ability to work as a pharmacist,
4    and I expect the Court will order that as well.  It's part of
5    the Plea Agreement.  He's not fighting that.  He knows he's
6    losing his ability to practice as a pharmacist ever again.
7    And of the two careers, frankly, that's the one he loved the
8    most, and I think you heard him say that.  But I've been
9    representing him for two plus years now, and that's been a
10   consistent refrain of his that that's substantial among many
11   others, including the community impact regret that he has.

12        I'm not his disciplinary counsel.  He's engaged two other
13   council, one in each respective state, New Jersey and
14   Pennsylvania, in the disciplinary matters.  But I understand
15   from just -- you know, as we all do as attorneys, we get
16   bulletins and see what kind of impact these things have on
17   people.  That -- and I practice a lot in New Jersey, which is
18   where my primary office is.

19             THE COURT:  Right.

20             MR. CIPPARONE:  New Jersey is -- I don't want to use
21   the word "draconian" because I don't want to be unfair to the
22   state, but its professional licensing decisions are not
23   liberal and not --

24             THE COURT:  I understand that.  Yes.

25             MR. CIPPARONE:  -- generous.  And so I'm relatively

1   confident that he's either going to lose his license to
2   practice law in New Jersey.  And disbarment there, unlike in
3   Pennsylvania, as Your Honor probably knows, is permanent
4   disbarment.  You can't --

5             THE COURT:  Right.

6             MR. CIPPARONE:  -- reapply after five years.  You
7   lose your ticket, you've lost it forever.  I think that's a
8   real risk in this situation for Mr. Goodman.  Although
9   Pennsylvania is a little more user friendly -- and I'm not
10  using terms of art here -- to attorneys who engage in
11  transgressions, from my understanding from his disciplinary
12  attorneys, in anecdotal conversations about what might happen
13  here, at a minimum, he's likely to face a substantial
14  suspension and very likely potentially to face disbarment as
15  well.

16       And he's 60 years old, and that's difficult to recover
17  from when they're the only two things you've done your entire
18  life, not that he's not a resourceful person that he won't
19  survive whatever happens.  I know he will because of my
20  interaction with him.  I know he's a strong person.  But I'd
21  ask the Court to consider that those consequences, albeit
22  collateral and not anybody's fault but Mr. Goodman's, are
23  still punitive in nature from a general deterrence perspective
24  when you're sentencing and considering parity about similarly
25  situated persons.

**1**      As Mr. Goodman said, this case has had a substantial,

**2**   again, collateral, but nonetheless significant financial

**3**   impact on him.  I'm not going to get into my fees, but I'm not

**4**   cheap, for lack of a better term, or inexpensive.  And this

**5**   has been a longstanding case, both on the civil side.  As you

**6**   know --

**7**               THE COURT:  Right.

**8**               MR. CIPPARONE:  -- there was a pending civil case --

**9**               THE COURT:  Before Judge Kearney, I believe.

**10**              MR. CIPPARONE:  -- before Judge Kearney that's now

**11**  been resolved.  As well as on the criminal side, there was

**12**  voluminous discovery.  There were substantial motions filed

**13**  before Your Honor in the run up to --

**14**              THE COURT:  Right.

**15**              MR. CIPPARONE:  -- trial, all of which has had a

**16**  substantial impact on him and his wife.  They had to sell

**17**  their home, liquidate some of their assets.  And Mr. Goodman

**18**  also, as I indicated in my Sentencing Memorandum, agreed to

**19**  pay the Government on the civil side to settle that case,

**20**  $60,000, which he did a wire transfer yesterday.

**21**      And the timing of that may seem like he was doing it

**22**  right before sentencing so I could stand here and say that,

**23**  but the timing was only because I had been asking the

**24**  Government for the payment instructions from the very day we

**25**  reached the handshake deal on the Settlement Agreement.  But

1    as Your Honor knows, sometimes, there are layers in the
2    Government --

3              THE COURT:  Right.

4              MR. CIPPARONE:  -- that have to take time.  And I
5    got the wire transfer instructions over the weekend, and Mr.
6    Goodman made that payment yesterday.  So the timing may seem
7    coincidental, but it was that, purely that, simply
8    coincidental.

9         But that $60,000 doesn't represent discouragement, and I
10   think the Court knows that from the papers.  But again, Mr.
11   Goodman did not profit from any of these activities.  All of
12   that money, as I understand it, went into Mr. Spivack's
13   coffers.  And so when Mr. Goodman paid $60,000, he wasn't
14   simply paying back ill-gotten gains.  He wasn't paying back
15   anything.  That was coming out of his pocket when he did not
16   profit from this.

17        And that's collaterally punitive, although it wasn't the
18   intent of it.  I understand, and that's why civil cases are
19   settled.  But it's something I ask the Court to consider when
20   you're looking at general deterrence as well.  These are
21   things that he suffered that do send a message to similarly
22   situated people.  If you're a pharmacist and you're thinking
23   about doing this, I know Mr. Goodman can attest to the fact.
24   And what's on the record here can tell people this is going to
25   be emotionally costly.

1         I think you could see that his emotion was genuine about

2    the impact it's had on him and his family, and, you know, he's

3    lucky.  And we all see in Court, and I've been to Court with

4    many clients, whether they're, you know, paying clients, CJA

5    clients, who come to Court with nowhere near the kind of

6    support, if any --

7              THE COURT:  Right.

8              MR. CIPPARONE:  -- that Mr. Goodman has.  And that's

9    a testament to the kind of person and the kind of life he's

10   led, this aberration aside.  And as Ms. Titus said, they're

11   all standing by him because they know the good man that he

12   actually is.  So I would ask the Court to consider that, the

13   history and characteristics of Mr. Goodman have been addressed

14   by the others who know him much better than I do, of course.

15        But I do note that he's 60 years old and no prior

16   criminal record.  And from the statistics, I said it to Your

17   Honor and the Sentencing Commission studies, he is among the

18   least likely group of offenders to recidivate.  I think it's a

19   safe bet for me, at least, and I know Your Honor can't say

20   that, but I can say I truly don't -- do not believe that Mr.

21   Goodman ever would recidivate or would be standing in front of

22   any -- hopefully, he's able to stand in front of judges in the

23   future but as a litigator and not as a litigant, as a

24   Defendant in a criminal case.  And I truly believe he will not

25   be.

1        His conduct wasn't motivated by greed.  It's hard to

2    figure out what it was motivated by, except I do accept what

3    he said in his letter.  He worked in a small community

4    pharmacy with a single owner.  He kind of came into this, you

5    know, in terms of a long-standing practice, and he went along

6    to get along, and that was a loss of his moral compass.  He

7    acknowledges that, but that's why he did it.  And it's not a

8    great reason, but it is the reason, and his actions were just

9    a deviation and an aberrational one at that.

10        He already lost much for no gain.  He just got nothing

11   out of this, but the -- and I know he caused heartache to the

12   community.  I'm not diminishing that, either.  I'm not

13   diminishing the impact of what he did on the community.  And I

14   acknowledge -- and I'm not going to take on the opioid crisis

15   in this hearing.  I'm going to acknowledge that.  And albeit,

16   hopefully, it was only a small contribution, his actions were

17   a contribution to that.  And I'm not going to shy away from

18   that.  I'd be disingenuous if I did.

19        But he lost much for nothing and no personal gain.  He's

20   had a solid employment history.  He's built an exemplary

21   family life.  And I think, you know, besides the community

22   impact and all those other things I talked about, that's

23   what's plagued Mr. Goodman the most, is that he at least self-

24   flagellates as to what he thinks has -- which I believe has

25   not since I've talked to them -- changed their perception of

**1**    **him.  I don't think it has changed their perception, but**

**2**    **obviously, his family means and has meant everything to him.**

**3**    **But having that support structure, I think, bodes well**

**4**    **for his future, in addition, regardless of the consequences**

**5**    **that Your Honor imposes.  But I hope Your Honor considers that**

**6**    **and regardless of whatever happens to him professionally.  But**

**7**    **I do think those consequences can and should be considered by**

**8**    **the Court as adequate for not only specific, but equally**

**9**    **importantly, general deterrence that a probation sentence**

**10**    **would still send an adequate deterrent message when you will**

**11**    **have, as a former professional pharmacist or licensed**

**12**    **pharmacist that's hopefully maybe at some point in the future**

**13**    **or continuing as a licensed attorney, the lasting stigma of**

**14**    **anybody, first of all, because this case got some -- I use the**

**15**    **word "notoriety" or press (inaudible).**

**16**    **So, you know, we know we can't expunge federal**

**17**    **convictions anyway.  They're lifelong.  But you also cannot**

**18**    **expunge Google.  So anytime anybody types in the name Todd**

**19**    **Goodman from the day forward or from the day the indictment**

**20**    **got publicized or even the civil complaint got publicized,**

**21**    **that's what they're going to primarily read about Todd Goodman**

**22**    **before they get to his skills as a lawyer, before they get to**

**23**    **his community service as a coach, before they get to his**

**24**    **family relationships.**

**25**    **He's not going to be able to escape that.  And that's a**

**1**    **general deterrent message as well, the loss of his career and**
**2**    **his earning capacity, at least as a pharmacist and probably as**
**3**    **a lawyer, at least for a period of time, if not forever.  The**
**4**    **impact on his financial assets, I've already talked about.**
**5**    **And again, the distinction of the fact that Mr. Goodman was**
**6**    **not the face of Verree.**

**7**    **You know, even the Ahmeds that the Government referenced,**
**8**    **Mr. Ahmed consistently said he would look for Eric Pestrack**
**9**    **every time he went into the pharmacy.  That was the conduit to**
**10**   **his actions.  I'm not suggesting that Mr. Goodman didn't take**
**11**   **part in that, didn't do his role in -- as the pharmacist**
**12**   **filling the prescription, but it was, you know Mr. Pestrack**
**13**   **and Mr. Spivack's atmosphere that Mr. Ahmed talked about, not**
**14**   **Mr. Goodman specifically.**

**15**   **I don't know if, you know, the Government is going to**
**16**   **speak again and ask you to look at parity between Mr.**
**17**   **Spivack's sentence, but I don't think that's a fair**
**18**   **comparison.  Mr. Spivack owned the pharmacy, put millions of**
**19**   **dollars in his pocket, and Mr. Goodman did not.  And he was**
**20**   **only there part time.  So while certainly it was foreseeable**
**21**   **that some of these things were going on when he wasn't there,**
**22**   **he wasn't participating in them and on that kind of sustained**
**23**   **basis that Mr. Pestrack, Mr. Goodman, and others were as well.**
**24**   **So for all those reasons, Your Honor, and I hopefully was**
**25**   **more articulate in my Sentencing Memorandum, I would ask the**

1    Court to impose a sentence of probation on Mr. Goodman.  If

2    the Court did feel that more confining circumstances were

3    warranted, I would suggest house arrest is still a competent

4    alternative.  It's still punitive.  It still sends a deterrent

5    message, generally and specifically, although, again, I don't

6    think the latter is necessary.  For all those reasons, I would

7    ask the Court to impose probation with no incarceration in a

8    federal facility.

9              THE COURT:  Thank you.

10             MR. CIPPARONE:  Thank you, Your Honor.

11             THE COURT:  Ms. Geiger?

12             MS. GEIGER:  Nothing further from the Government,

13    Your Honor.

14             THE COURT:  All right.  Mr. Goodman, you have

15    pleaded guilty before this Court to one count of knowingly

16    dispensing a controlled substance without a valid prescription

17    and aiding and abetting in violation of Title 21 United States

18    Code, Section 841(a)(1) and (c)(2)(a) and Title 18 United

19    States code Section 2.

20         The Court must first calculate your sentence under the

21    Advisory Sentencing Guidelines.  The Court finds that the base

22    offense level is six.  The Court further finds that you are a

23    0-point offender and that you meet all the criteria under

24    Section 4 (c)(1.1) of the Advisory Sentencing Guidelines,

25    which permits me to depart downward two levels bring it -- us

**1**    down to level 4.  However, I find that the special skill

**2**    enhancement, as we discussed earlier, is applicable under

**3**    Section 3(b)(1.3), since you were a licensed pharmacy --

**4**    pharmacist at the time of the offense.  The Court therefore

**5**    adds two levels to level four, bringing us back to level six.

**6**        The Court finds you have accepted responsibility for your

**7**    conduct, which permits me to depart downward two levels so

**8**    that the total offense level is four.  You have no criminal

**9**    history points for a criminal history category of one, and

**10**   under the Advisory Sentencing Guidelines, you could be

**11**   sentenced to between zero and six months in prison.

**12**       Before determining what sentence to impose, I must take

**13**   into account the various factors under Title 18 United States

**14**   Code Section 3553(a) and fashion a sentence which is

**15**   sufficient but not greater than necessary.  The factors which

**16**   are relevant here that I must consider are the nature and

**17**   circumstance of the offense and the history and

**18**   characteristics of you, the Defendant, the seriousness of the

**19**   offense, the need to promote respect for the law, the need to

**20**   provide a just punishment for the offense, the need to afford

**21**   adequate deterrence to criminal conduct, the need to protect

**22**   the public from further crimes of the Defendant, and the need

**23**   to avoid unwarranted sentencing disparities among Defendants

**24**   with similar records who have been found guilty of similar

**25**   conduct.

**1**      **First, I turn to the issue of the seriousness of the**
**2**  **offense.  You're, of course, pleading guilty here today to a**
**3**  **misdemeanor to one count, but that crime is not an**
**4**  **insignificant matter, Mr. Goodman.  In light of your relevant**
**5**  **conduct, this was not, in my view, an aberrational event, a**
**6**  **one-time situation where you dispensed drugs illegally.  But I**
**7**  **think the history shows that this type of conduct was going on**
**8**  **for a number of years.**

**9**      **The Court, of course, needs to promote respect for the**
**10** **law.  Violating the Controlled Substances Act of the United**
**11** **States is a -- is really a serious matter.  As has been**
**12** **mentioned here, we do have a serious opioid crisis in the**
**13** **United States, and we also have a significant opioid crisis,**
**14** **more particularly here in Philadelphia in its suburbs.  And**
**15** **you were contributing to that situation.  Somebody's husband,**
**16** **wife, child were being harmed by what you were doing.**

**17** **The Court does need to be concerned about deterrence to**
**18** **deter particularly other pharmacists and other people working**
**19** **in pharmacies from engaging in this kind of conduct.  The**
**20** **Court also must do its best to deter people who are lawyers**
**21** **from engaging in this conduct.  And while I have no doubt that**
**22** **you will no longer be involved with the criminal justice**
**23** **system after this, I do have concern about general deterrence**
**24** **of others out there who may be involved or considering being**
**25** **involved in such conduct.**

**1**      And with respect to the need to protect the public from

**2**   further crimes of you, the Defendant, I'm not all that

**3**   concerned about that.  As I said, I think you will have

**4**   learned your lesson and will not be involved in criminal

**5**   conduct again.

**6**      Turning to your history and characteristics, as I said,

**7**   I've read all the letters that have been submitted to me.  I

**8**   see the number of friends and family who are here to support

**9**   you.  I've listened carefully to what the character witnesses

**10**   have had to say, and I have no doubt that you have done a lot

**11**   of good in your life, both as a family member, as a father, as

**12**   a husband, as a friend, and you've done some good in the

**13**   community, as it has been recited in the letters that I've

**14**   read and has been testified to here in the Courtroom this

**15**   morning.

**16**      What troubles me not only that the act was not

**17**   aberrational but that you were a licensed pharmacist and also

**18**   a member of the bar.  For someone in your position who had the

**19**   skills you had and certainly the knowledge that this type of

**20**   conduct was not only unacceptable but unlawful is very

**21**   troubling to me.

**22**      Under the totality of the circumstances, Mr. Goodman, I'm

**23**   going to commit you into the custody of the Attorney General

**24**   of the United States for a period of imprisonment of four

**25**   months, which -- a sentence which I find sufficient but not

1   greater than necessary to be followed by one year of

2   supervised release.  As a condition of that supervised

3   release, you will be prohibited from handling, dispensing,

4   dispersing, or otherwise being involved with controlled

5   substances or any prescriptions for drugs, whether or not they

6   involve controlled substances.

7       I impose the penalty of a $1,000 fine to be paid within

8   30 days of the signing of a judgment and commitment order, and

9   you are to pay a special assessment of $25 immediately.  To

10  the extent you have not waived your right to appeal, I advise

11  you of your right to appeal your sentence to the United States

12  Court of Appeals for the Third Circuit.  If you cannot afford

13  counsel, the Court will appoint counsel to represent you free

14  of charge.  Any notice of appeal must be filed within 14 days

15  after I sign the Judgment and Commitment Order.  If you wish

16  for a Notice of Appeal to be entered, you may indicate that to

17  the deputy clerk, Ms. Spicer, and she will enter a Notice of

18  Appeal on your behalf.

19      It's a very sad day, Mr. Goodman.  The punishment that's

20  being imposed, unfortunately, is going to have serious effect

21  on your family and your friends, but that's unfortunately a

22  collateral consequence of any sentencing that takes place.  I

23  hope hereon you will be a productive and useful citizen.

24  Anything further at this time?  Oh, are you going to dismiss

25  the indictment?

**1**          MS. GEIGER:  Yes, Your Honor, as to Mr. Goodman.

**2**          THE COURT:  All right.  Are you going to submit a

**3**    separate Order on that, or do you -- all right.  It is here.

**4**    All right.  I will sign that order dismissing the indictment.

**5**          MS. GEIGER:  Thank you, Your Honor.  Nothing

**6**    further.

**7**          THE COURT:  And the surrender date will be February

**8**    1st, 2024, so you may self-surrender on that date.  Anything

**9**    further at this time?

**10**         MR. CIPPARONE:  Your Honor, I would ask the Court to

**11**   -- I know it's not binding on the Bureau of Prisons.  Would

**12**   you recommend incarceration at FCI Fairton, if it's an

**13**   appropriately designated facility?

**14**         THE COURT:  I will do that since it's fairly close

**15**   to Philadelphia.

**16**         MR. CIPPARONE:  Thank you, Your Honor.

**17**         THE COURT:  Yes.

**18**         MR. CIPPARONE:  I appreciate that.

**19**         THE COURT:  I'll be happy -- anything further?

**20**         MS. GEIGER:  Nothing from the Government, Your

**21**   Honor.  Thank you.

**22**         THE COURT:  Mr. Cipparone?

**23**         MR. CIPPARONE:  Nothing from the Defense, Your

**24**   Honor.  I assume I'll receive a revised Pre-Sentence Report?

**25**         THE COURT:  Yes, that will be done.

1          MR. CIPPARONE:  Okay.

2          THE COURT:  Thank you very much.

3          MR. CIPPARONE:  Thank you, Your Honor.

4          THE CLERK:  All rise.

5      (Court adjourned)

6

7                    CERTIFICATION
8    I, Lewis Parham, certify that the foregoing is a correct
9    transcript from the electronic sound recording of the
10   proceedings in the above-entitled matter.
11
12
13   *Lewis Parham*                    1/12/24
14
15   _____    _____
16   Signature of Transcriber              Date